(Slip Opinion) OCTOBER TERM, 2022 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JONES *v.* HENDRIX, WARDEN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 21–857. Argued November 1, 2022—Decided June 22, 2023

In 2000, the District Court for the Western District of Missouri sentenced petitioner Marcus DeAngelo Jones after he was convicted on two counts of unlawful possession of a firearm by a felon, in violation of 18 U. S. C. §922(g)(1), and one count of making false statements to acquire a firearm. The Eighth Circuit affirmed Jones' convictions and sentence. Jones then filed a motion pursuant to 28 U. S. C. §2255, which resulted in the vacatur of one of his concurrent §922(g) sentences. Many years later, this Court held in *Rehaif* v. *United States*, 588 U. S. ___, that a defendant's knowledge of the status that disqualifies him from owning a firearm is an element of a §922(g) conviction. *Rehaif*'s holding abrogated contrary Eighth Circuit precedent applied by the courts in Jones' trial and direct appeal. Seeking to collaterally attack his remaining §922(g) conviction based on *Rehaif*'s statutory holding, Jones filed a petition for a writ of habeas corpus under 28 U. S. C. §2241 in the district of his imprisonment, the Eastern District of Arkansas. The District Court dismissed Jones' habeas petition for lack of subject-matter jurisdiction, and the Eighth Circuit affirmed.

*Held*: Section 2255(e) does not allow a prisoner asserting an intervening change in interpretation of a criminal statute to circumvent the Antiterrorism and Effective Death Penalty Act of 1996's (AEDPA) restrictions on second or successive §2255 motions by filing a §2241 habeas petition. Pp. 3–25.

 (a) Congress created §2255 as a remedial vehicle by which federal prisoners could collaterally attack their sentences by motion in the sentencing court, rather than by a petition for a writ of habeas corpus under §2241 in the district of confinement. The "sole purpose" of §2255 was to address the "serious administrative problems" created by district courts collaterally reviewing one another's proceedings without

access to needed evidence and "aggravated" by the concentration of federal prisoners in certain judicial districts that therefore faced "an inordinate number of habeas corpus actions." *United States* v. *Hayman*, 342 U. S. 205, 212–214, 219. To make this change effective, Congress generally barred federal prisoners "authorized" to file a §2255 motion from filing a petition under §2241. But—in a provision of §2255(e) now known as the saving clause—Congress preserved access to §2241 in cases where "the remedy by motion is inadequate or ineffective to test the legality of [a prisoner's] detention."

Congress later enacted AEDPA, which, as relevant here, barred second or successive §2255 motions unless based on either "newly discovered evidence," §2255(h)(1), or "a new rule of constitutional law," §2255(h)(2). Some courts faced with AEDPA's second-or-successive restrictions held that §2255 was "inadequate and ineffective" under the saving clause when AEDPA's restrictions barred a prisoner from seeking relief based on a new interpretation of a criminal statute that circuit precedent had foreclosed at the time of the prisoner's trial, appeal, and first §2255 motion.

Section 2255(e)'s saving clause does not authorize that end-run around AEDPA. The clause preserves recourse to §2241 in cases where unusual circumstances make it impossible or impracticable to seek relief in the sentencing court, as well as for challenges to detention other than collateral attacks on a sentence. But §2255(h) specifies the two limited conditions in which federal prisoners may bring second or successive collateral attacks on their sentences. The inability of a prisoner with a statutory claim to satisfy §2255(h) does not mean that the prisoner may bring the claim in a §2241 petition. Pp. 3–12.

(b) Jones and the United States each advance unpersuasive theories of when and why §2255(h)'s exclusion of statutory claims sometimes renders §2255 inadequate or ineffective for purposes of the saving clause. Pp. 12–25.

(1) Jones argues that §2255 is necessarily "inadequate or ineffective to test" a prisoner's claim if the §2255 court fails to apply the correct substantive law. But the saving clause is concerned with the adequacy or effectiveness of the remedial vehicle ("the remedy by motion"), not any court's asserted errors of law. Next, Jones argues that courts of equity would afford relief from "inadequate" legal remedies in a broad range of circumstances; to the extent relevant to §2255(e), this proves at most that a variety of practical obstacles might trigger the saving clause, cf. *Hayman*, 342 U. S., at 215, n. 23, not that the clause offers an exemption from AEDPA's limits on second or successive collateral attacks. Jones further argues that the saving clause's use of the present tense ("is inadequate or ineffective") means that §2241 is available whenever a prisoner is presently unable to file

a §2255 motion. That argument would nullify AEDPA's limits on collateral relief.

Jones suggests that denying him the chance to raise his *Rehaif* claim in a §2241 petition would violate the Suspension Clause, U. S. Const., Art. I, §9, cl. 2. This argument fails because it would extend the writ of habeas corpus far beyond its scope when the Constitution was drafted and ratified. *Department of Homeland Security* v. *Thuraissigiam*, 591 U. S. \_\_\_, \_\_\_. When the Suspension Clause was adopted, Jones' *Rehaif* claim would not have been cognizable in habeas at all. At the founding, a sentence after conviction "by a court of competent jurisdiction" was "'in *itself* sufficient cause'" for a prisoner's continued detention. *Brown* v. *Davenport*, 596 U. S. \_\_\_, \_\_\_ (quoting *Ex parte Watkins*, 3 Pet. 193, 202). Of particular relevance here, a habeas court had no power to "look beyond the judgment" to "re-examine the charges on which it was rendered" for substantive errors of law—even "if . . . the [sentencing] court ha[d] misconstrued the law, and ha[d] pronounced an offence to be punishable criminally, which [was] not so." *Id.*, at 202, 209. While Jones argues that pre-founding practice was otherwise, he fails to identify a single clear case of habeas being used to relitigate a conviction after trial by a court of general criminal jurisdiction.

The principles of *Ex parte Watkins* guided this Court's understanding of the habeas writ throughout the 19th century and well into the 20th. See *Brown*, 596 U. S., at \_\_\_, n. 1 (collecting cases). It was not until 1974, in *Davis* v. *United States*, 417 U. S. 333, that the Court held for the first time that a substantive error of statutory law could be a cognizable ground for a collateral attack on a federal court's criminal judgment. See *id.*, at 342–347. The Suspension Clause neither constitutionalizes that innovation nor requires its extension to a second or successive collateral attack.

Jones' remaining constitutional arguments are no more persuasive. He argues that denying him a new opportunity for collateral review of his *Rehaif* claim threatens Congress's exclusive power to define crimes, but a court does not usurp legislative power simply by misinterpreting the law in a given case. Next, Jones points to *Fiore* v. *White*, 531 U. S. 225 (*per curiam*), which applied the rule that due process requires that the prosecution prove every element of a crime beyond a reasonable doubt. But due process does not guarantee a direct appeal, *McKane* v. *Durston*, 153 U. S. 684, 687, let alone the opportunity to have legal issues redetermined in successive collateral attacks. Finally, the Eighth Amendment's constraint on the kinds of punishments governments may inflict creates no independent entitlement to a second round of postconviction review. Pp. 12–20.

(2) The Government asks the Court to adopt a novel interpretation of §2255(e)'s saving clause based on an elaborate argument. Starting from the premise that the words "inadequate or ineffective" imply reference to a "benchmark" of adequacy and effectiveness, the Government equates that benchmark with the types of claims cognizable in federal habeas petitions by *state* prisoners under the general habeas statutes. The Government ultimately concludes that §2255(h) renders §2255 "inadequate or ineffective to test" a federal prisoner's statutory claim in cases where the prisoner has already filed one §2255 motion and the claim otherwise satisfies pre-AEDPA habeas principles, which generally will require "a 'colorable showing of factual innocence.'" *McCleskey* v. *Zant*, 499 U. S. 467, 495 (quoting *Kuhlmann* v. *Wilson*, 477 U. S. 436, 454 (plurality opinion)).

The Court sees no indication that the saving clause adopts the Government's state-prisoner-habeas benchmark. In any event, that benchmark has uncertain relevance to the question presented here because federal habeas relief does not lie for errors of state law. The Government's theory ultimately rests instead on its assertion that §2255(h) is simply not clear enough to support the inference that Congress entirely closed the door on pure statutory claims not brought in a federal prisoner's initial §2255 motion. That assertion is unpersuasive.

The Government asserts that the Court must require "the clearest command" before construing AEDPA to "close [the] courthouse doors" on "a strong equitable claim" for relief. *Holland* v. *Florida*, 560 U. S. 631, 646, 649 (internal quotation marks omitted). But AEDPA's restrictions embody Congress's policy judgment regarding the appropriate balance between finality and error correction. The Court declines to adopt a presumption against finality. Further, the Court typically has found clear-statement rules appropriate when a statute implicates historically or constitutionally grounded norms that the Court would not expect Congress to unsettle lightly. See, *e.g.*, *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ___, ___ (*per curiam*). As far as history and the Constitution are concerned, "there is nothing incongruous about a system in which this kind of error—the application of a since-rejected statutory interpretation—cannot be remedied after final judgment," *George* v. *McDonough*, 596 U. S. ___, ___, and thus nothing fundamentally surprising about Congress declining to make such errors remediable in a *second or successive* collateral attack. Pp. 20–25.

8 F. 4th 683, affirmed.

THOMAS, J., delivered the opinion of the Court, in which ROBERTS, C. J., and ALITO, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. SOTOMAYOR

Syllabus

and KAGAN, JJ., filed a dissenting opinion. JACKSON, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

―――――――

No. 21–857

―――――――

## MARCUS DEANGELO JONES, PETITIONER *v.* DEWAYNE HENDRIX, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 22, 2023]

JUSTICE THOMAS delivered the opinion of the Court.

This case concerns the interplay between two statutes: 28 U. S. C. §2241, the general habeas corpus statute, and §2255, which provides an alternative postconviction remedy for federal prisoners. Since 1948, Congress has provided that a federal prisoner who collaterally attacks his sentence ordinarily must proceed by a motion in the sentencing court under §2255, rather than by a petition for a writ of habeas corpus under §2241. To that end, §2255(e) bars a federal prisoner from proceeding under §2241 "unless . . . the [§2255] remedy by motion is inadequate or ineffective to test the legality of his detention."

Separately, since the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), second or successive §2255 motions are barred unless they rely on either "newly discovered evidence," §2255(h)(1), or "a new rule of constitutional law," §2255(h)(2). A federal prisoner may not, therefore, file a second or successive §2255 motion based solely on a more favorable interpretation of statutory law adopted after his conviction became final and his initial §2255 motion was resolved.

The question presented is whether that limitation on second or successive motions makes §2255 "inadequate or ineffective" such that the prisoner may proceed with his statutory claim under §2241. We hold that it does not.

I

In 2000, the U. S. District Court for the Western District of Missouri convicted petitioner Marcus DeAngelo Jones of two counts of unlawful possession of a firearm by a felon, in violation of 18 U. S. C. §922(g)(1), and one count of making false statements to acquire a firearm, in violation of §922(a)(6). The Court of Appeals for the Eighth Circuit affirmed his convictions and sentence of 327 months' imprisonment. See *United States* v. *Jones*, 266 F. 3d 804 (2001). After losing his appeal, Jones filed a timely §2255 motion to vacate, set aside, or correct his sentence, which resulted in the vacatur of one of his concurrent §922(g) sentences but no other relief. See *United States* v. *Jones*, 403 F. 3d 604 (CA8 2005); *United States* v. *Jones*, 185 Fed. Appx. 541 (CA8 2006) (*per curiam*).

Years later, in *Rehaif* v. *United States*, 588 U. S. ___ (2019), this Court held that a defendant's knowledge of the status that disqualifies him from owning a firearm is an element of a §922(g) conviction. In doing so, it abrogated the Eighth Circuit's contrary precedent, which the Western District of Missouri and the Eighth Circuit had applied in Jones' trial and direct appeal. See *Jones*, 266 F. 3d, at 810, n. 5.

After *Rehaif*, Jones hoped to leverage its holding into a new collateral attack on his remaining §922(g) conviction. But *Rehaif*'s statutory holding satisfied neither of §2255(h)'s gateway conditions for a second or successive §2255 motion: It was neither "newly discovered evidence," §2255(h)(1), nor "a new rule of *constitutional* law," §2255(h)(2) (emphasis added). Unable to file a new §2255 motion in his sentencing court, Jones instead looked to

§2255(e)'s "saving clause," which provides that a federal prisoner may file a petition for a writ of habeas corpus under §2241 if—and only if—§2255's "remedy by motion is inadequate or ineffective to test the legality of his detention." Invoking this clause, Jones petitioned the U. S. District Court for the Eastern District of Arkansas, the district where he was imprisoned, for a writ of habeas corpus under §2241.

The District Court dismissed Jones' habeas petition for lack of subject-matter jurisdiction, and the Eighth Circuit affirmed. 8 F. 4th 683 (2021). The Eighth Circuit rejected Jones' argument that the saving clause permits recourse to §2241 to present a §2255(h)-barred claim based on an intervening decision of statutory interpretation, as well as his argument that foreclosing relief on his *Rehaif* claim would violate the Suspension Clause, U. S. Const., Art. I, §9, cl. 2. In doing so, the Eighth Circuit deepened a split among the Courts of Appeals about whether prisoners in Jones' circumstances may resort to §2241 via the saving clause.

We granted certiorari. 596 U. S. \_\_\_ (2022). The Solicitor General then noticed her intent to defend the Eighth Circuit's judgment but not its rationale. We appointed Morgan Ratner as *amicus curiae* to argue in support of the Eighth Circuit's reasoning. 597 U. S. \_\_\_ (2022). She has ably discharged her responsibilities.

## II

Consistent with the Eighth Circuit's reasoning, we hold that §2255(e)'s saving clause does not permit a prisoner asserting an intervening change in statutory interpretation to circumvent AEDPA's restrictions on second or successive §2255 motions by filing a §2241 petition. We begin by considering the role of the saving clause in §2255 prior to AEDPA's enactment. We then consider the impact of AEDPA on the statutory scheme.

A

In relevant part, §2255 provides:

"(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

.          .          .          .          .

"(e) An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."

In understanding this statutory text, "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921). Section 2255 is an outgrowth of the historic habeas corpus powers of the federal courts as applied to the special case of federal prisoners. The First Judiciary Act authorized the federal courts "to grant writs of *habeas corpus* for the purpose of an inquiry into the cause of commitment," with a proviso that such writs could "extend to prisoners in gaol" only "where they [were] in custody, under or by colour of the authority of the United States, or [were] committed for trial before some court of the same, or [were] necessary to be brought into court to testify." Act of Sept. 24, 1789, §14, 1 Stat. 82. In 1867, Congress expanded the federal courts' habeas powers to

cover "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." Ch. 28, 14 Stat. 385. For most of our Nation's history, a federal prisoner "claiming the right to be released," §2255(a), in a collateral attack on his sentence would have relied on these Acts and their successors.

That changed with the 1948 recodification and reorganization of the Judiciary Code. See generally 62 Stat. 869. In enacting the present Title 28 of the United States Code, Congress largely recodified the federal courts' pre-existing habeas authority in §§2241 and 2243, which, respectively, confer the power to grant the writ and direct the issuing court to "dispose of the matter as law and justice require." *Id.*, at 964–965. At the same time, however, Congress created §2255 as a separate remedial vehicle specifically designed for federal prisoners' collateral attacks on their sentences.[1] *Id.*, at 967–968.

The "sole purpose" of this innovation, as this Court acknowledged a few years later, "was to minimize the difficulties encountered in habeas corpus hearings by affording the same rights in another and more convenient forum." *United States* v. *Hayman*, 342 U. S. 205, 219 (1952); see also *Davis* v. *United States*, 417 U. S. 333, 343 (1974) ("[Section] 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus"); accord, *United States* v. *Addonizio*, 442 U. S. 178, 185 (1979); *Hill* v. *United*

---

[1] As first enacted, §2255 applied to any "prisoner in custody under sentence of a court of the United States." 62 Stat. 967. In 1949, Congress substituted "court established by Act of Congress" for "court of the United States," making no other changes. §114, 63 Stat. 105 (internal quotation marks omitted). Section 2255 was not again amended until AEDPA, and the only post-AEDPA amendment simply added the current lettering and numbering to what were previously undesignated paragraphs. Court Security Improvement Act of 2007, §511, 121 Stat. 2545. For simplicity, we use §2255's current internal designations throughout this opinion.

*States*, 368 U. S. 424, 427 (1962).  Experience had shown
that processing federal prisoners' collateral attacks on their
sentences through habeas proceedings—and, therefore,
through the judicial districts in which they were confined—
resulted in "serious administrative problems."  *Hayman*,
342 U. S., at 212.  Most significantly, a federal prisoner's
district of confinement was often far removed from the rec-
ords of the sentencing court and other sources of needed ev-
idence.  *Id.*, at 212–213.  These difficulties were "greatly ag-
gravated" by the concentration of federal prisoners in a
handful of judicial districts, which forced those District
Courts to process "an inordinate number of habeas corpus
actions."  *Id.*, at 213–214.

Section 2255 solved these problems by rerouting federal
prisoners' collateral attacks on their sentences to the courts
that had sentenced them.  To make this change of venue
effective, Congress generally barred federal prisoners "au-
thorized to apply for relief by motion pursuant to" §2255
from applying "for a writ of habeas corpus" under §2241.
§2255(e).  But, in a provision that has come to be known as
the saving clause, Congress preserved the habeas remedy
in cases where "the remedy by motion is inadequate or in-
effective to test the legality of [a prisoner's] detention."
*Ibid.*

Traditionally, courts have treated the saving clause as
covering unusual circumstances in which it is impossible or
impracticable for a prisoner to seek relief from the sentenc-
ing court.  The clearest such circumstance is the sentencing
court's dissolution; a motion in a court that no longer exists
is obviously "inadequate or ineffective" for any purpose.
See, *e.g.*, *Witham* v. *United States*, 355 F. 3d 501, 504–505
(CA6 2004) (finding §2255 inadequate or ineffective after
court-martial was dissolved); *Edwards* v. *United States*,
1987 WL 7562, *1 (EDNY, Feb. 9, 1987) (finding §2255 in-
adequate or ineffective after District Court of the Canal
Zone was dissolved); cf. *Spaulding* v. *Taylor*, 336 F. 2d 192,

193 (CA10 1964) (finding §2255 inadequate or ineffective after Alaska territorial court was dissolved and federal and state successor courts declined §2255 and state-habeas jurisdiction, respectively). The saving clause might also apply when "it is not practicable for the prisoner to have his motion determined in the trial court because of his inability to be present at the hearing, or for other reasons."[2] *Hayman*, 342 U. S., at 215, n. 23 (internal quotation marks omitted).

In addition, the saving clause ensures that §2255(e) does not displace §2241 when a prisoner challenges "the legality of his *detention*" without attacking the validity of his *sentence*. To give a few examples, a prisoner might wish to argue that he is being detained in a place or manner not authorized by the sentence, that he has unlawfully been denied parole or good-time credits, or that an administrative sanction affecting the conditions of his detention is illegal. See generally *Samak* v. *Warden, FCC Coleman–Medium*, 766 F. 3d 1271, 1280 (CA11 2014) (Pryor, J., concurring) (explaining that "[t]he 'detention' of a prisoner encompasses much more than a criminal 'sentence'"). The briefs before us debate whether these types of challenges

---

[2] It bears mentioning that §2255 was enacted "eight years before President Eisenhower signed legislation funding the Interstate Highway System." Brief for Court-Appointed *Amicus Curiae* 17. At that time, it would not be surprising if removing a prisoner from the penitentiary, transporting him to the sentencing court for a hearing, and taking him back to prison again sometimes posed difficulties daunting enough to make a §2255 proceeding practically unavailable. Cf. *Stidham* v. *Swope*, 82 F. Supp. 931, 932–933 (ND Cal. 1949) (describing the difficulty and delay involved in transporting a prisoner "upwards of 1,500 miles" from the federal penitentiary in Alcatraz to the sentencing court in Missouri, a journey that "well could be two weeks" by rail). That this sort of practical inadequacy would be highly unusual today should not blind us to the world in which Congress was legislating when it enacted the saving clause.

depend on the saving clause or proceed under §2241 "directly." Compare Brief for Petitioner 31 and Brief for Respondent 37–38 with Brief for Court-Appointed *Amicus Curiae* 17–18. It is difficult to imagine a case in which this logical distinction would make any practical difference. That said, were it not for the saving clause, a literal reading of §2255(e) might be thought to bar *any* "application for a writ of habeas corpus in behalf of a [federal] prisoner," §2255(e), whether or not it challenged the "sentence . . . imposed," §2255(a). If nothing else, then, the saving clause guards against the danger that §2255(e) might be construed to bar manner-of-detention challenges even though they are not within §2255's substantive scope.

B

In 1996, Congress enacted AEDPA, which made significant reforms to the process of federal-court postconviction review for both state and federal prisoners. Most relevant here, AEDPA strictly limited "second or successive" §2255 motions to those that "contain—

> "(1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
> "(2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." §2255(h).

Importantly, AEDPA left the text of §2255(e) unchanged. But AEDPA's new second-or-successive restrictions indirectly gave rise to a novel application of the saving clause.

Mere months before AEDPA's enactment, this Court decided *Bailey* v. *United States*, 516 U. S. 137 (1995). That case interpreted the offense of "us[ing]" a firearm "during and in relation to any crime of violence or drug trafficking

crime," in violation of then-existing 18 U. S. C. §924(c)(1), more narrowly than many Circuits' previous case law. See 516 U. S., at 142 (describing the Circuits' approaches). Under this Court's §2255 precedent, *Bailey*'s narrowing interpretation was grounds for a collateral attack by federal prisoners who had been convicted under the Courts of Appeals' broader interpretations. See *Davis*, 417 U. S., at 342–347 (holding a claim of legal error based on an intervening change in statutory interpretation cognizable under §2255). Many prisoners with *Bailey* claims, however, had already exhausted their first §2255 motion, and *Bailey*'s statutory holding plainly did not satisfy either of §2255(h)'s conditions for a second or successive motion.

Several Courts of Appeals found a workaround for those prisoners in the saving clause. With minor differences in reasoning and wording, they held that §2255 was "inadequate and ineffective" under the saving clause—and that §2241 was therefore available—when AEDPA's second-or-successive restrictions barred a prisoner from seeking relief based on a newly adopted narrowing interpretation of a criminal statute that circuit precedent had foreclosed at the time of the prisoner's trial, appeal, and first §2255 motion. This application of the saving clause took shape in *In re Dorsainvil*, 119 F. 3d 245, 251 (CA3 1997); *Triestman* v. *United States*, 124 F. 3d 361, 378–380 (CA2 1997); and *In re Davenport*, 147 F. 3d 605, 609–611 (CA7 1998), and it was later adopted by most of the other Circuits. See *Ivy* v. *Pontesso*, 328 F. 3d 1057, 1059–1060 (CA9 2003); *Martin* v. *Perez*, 319 F. 3d 799, 804–805 (CA6 2003); *Reyes–Requena* v. *United States*, 243 F. 3d 893, 904 (CA5 2001); *In re Jones*, 226 F. 3d 328, 333–334 (CA4 2000); *Wofford* v. *Scott*, 177 F. 3d 1236, 1242–1245 (CA11 1999), overruled by *McCarthan* v. *Director of Goodwill Industries–Suncoast, Inc.*, 851 F. 3d 1076 (CA11 2017) (en banc); but see *Prost* v. *Anderson*, 636 F. 3d 578, 584–595 (CA10 2011) (Gorsuch, J.) (holding

that §2255(e) does not permit recourse to §2241 in these cir-
cumstances).

We now hold that the saving clause does not authorize
such an end-run around AEDPA. In §2255(h), Congress
enumerated two—and only two—conditions in which a sec-
ond or successive §2255 motion may proceed. Because
§2255 is the ordinary vehicle for a collateral attack on a fed-
eral sentence, the straightforward negative inference from
§2255(h) is that a second or successive collateral attack on
a federal sentence is not authorized unless one of those two
conditions is satisfied. See *Jennings* v. *Rodriguez*, 583 U. S.
___, ___ (2018) (slip op., at 16) ("'The expression of one thing
implies the exclusion of others'" (quoting A. Scalia & B.
Garner, Reading Law: The Interpretation of Legal Texts
107 (2012))). Even more directly, §2255(h)(2)'s authoriza-
tion of a successive collateral attack based on new rules "of
*constitutional* law" implies that Congress did not authorize
successive collateral attacks based on new rules of *noncon-
stitutional* law. Had Congress wished to omit the word
"constitutional," it easily could have done so.

The saving clause does not undermine this strong nega-
tive inference. Basic principles of statutory interpretation
require that we construe the saving clause and §2255(h) in
harmony, not set them at cross-purposes. See, *e.g.*, *United
States* v. *Fausto*, 484 U. S. 439, 453 (1988); *Bend* v. *Hoyt*, 13
Pet. 263, 272 (1839) (Story, J.). That task is not difficult
given the distinct concerns of the two provisions. Subsec-
tion (h) presumes—as part of its background—that federal
prisoners' collateral attacks on their sentences are gov-
erned by §2255, and it proceeds to specify when a *second or
successive* collateral attack is permitted. The saving clause
has nothing to say about that question. Rather, like sub-
section (e) generally, it addresses the antecedent question
of the relationship between §§2241 and 2255.

After AEDPA, as before it, the saving clause preserves
recourse to §2241 in cases where unusual circumstances

make it impossible or impracticable to seek relief in the sentencing court, as well as for challenges to detention other than collateral attacks on a sentence. Because AEDPA did not alter the text of §2255(e), there is little reason to think that it altered the pre-existing division of labor between §§2241 and 2255. AEDPA's new restrictions on §2255, therefore, are best understood as just that—restrictions on §2255—not as expansions of §2241's applicability.

Any other reading would make AEDPA curiously self-defeating. It would mean that, by expressly excluding second or successive §2255 motions based on nonconstitutional legal developments, Congress accomplished nothing in terms of actually limiting such claims. Instead, it would have merely rerouted them from one remedial vehicle and venue to another. Stranger still, Congress would have provided "a *superior* remedy" for the very nonconstitutional claims it chose not to include in §2255(h). *McCarthan*, 851 F. 3d, at 1091. After escaping §2255 through the saving clause, nonconstitutional claims would no longer be subject to AEDPA's other express procedural restrictions: the 1-year limitations period, see §2255(f ), and the requirement that a prisoner obtain a certificate of appealability before appealing an adverse decision in the District Court, see §2253(c)(1).[3] We generally "resist attributing to Congress an intention to render a statute so internally inconsistent." *Greenlaw* v. *United States*, 554 U. S. 237, 251 (2008).

That resistance is particularly acute here, where allowing nonconstitutional claims to proceed under §2241 would mean "resurrecting the very problems §2255 was supposed

---

[3] It is no answer to say that the saving clause must apply sometimes and that these procedural restrictions are inapplicable whenever it does. Cf. Reply Brief for Petitioner 12; Reply Brief for Respondent 9–10. Allowing second or successive nonconstitutional claims to circumvent §2255(h) under the saving clause would confer favored treatment for nonconstitutional claims *as a class*, a result directly at odds with the manifest tenor of §2255(h).

to put to rest." *Wright* v. *Spaulding*, 939 F. 3d 695, 707 (CA6 2019) (Thapar, J., concurring). Section 2255 owes its existence to Congress' pragmatic judgment that the sentencing court, not the District Court for the district of confinement, is the best venue for a federal prisoner's collateral attack on his sentence. Channeling a particular class of second or successive attacks back into §2241 would mean once again "[c]oncentrat[ing] 'an inordinate number of habeas corpus actions' in districts with large prison populations" and requiring District Courts "to review each other's proceedings—often without access to the witnesses, the sources of evidence, or other local information that may be critical." *Id.*, at 707–708 (quoting *Hayman*, 342 U. S., at 214). "The illogical results of applying such an interpretation . . . argue strongly against the conclusion that Congress intended these results." *Western Air Lines, Inc.* v. *Board of Equalization of S. D.*, 480 U. S. 123, 133 (1987).

Here, as often is the case, the best interpretation is the straightforward one. Section 2255(h) specifies the two limited conditions in which Congress has permitted federal prisoners to bring second or successive collateral attacks on their sentences. The inability of a prisoner with a statutory claim to satisfy those conditions does not mean that he can bring his claim in a habeas petition under the saving clause. It means that he cannot bring it at all. Congress has chosen finality over error correction in his case.

### III

Resisting this reading, Jones and the United States both argue that §2255(h)'s exclusion of statutory claims sometimes renders §2255 inadequate or ineffective, though they advance different theories of when and why it does so. Their arguments are unpersuasive.

### A

Jones begins with a textual interpretation of the saving

clause that, if accepted, would convert §2255(e) into a license for unbounded error correction. He argues that §2255 is necessarily "inadequate or ineffective to test" a prisoner's claim if the §2255 court fails to apply the correct substantive law. This argument ignores that the saving clause is concerned with the adequacy or effectiveness of the remedial *vehicle* ("the remedy by motion"), not any court's asserted errors of law. Cf. *Swain* v. *Pressley*, 430 U. S. 372, 383 (1977) (holding a District of Columbia-court remedy modeled on §2255 not to be "'inadequate or ineffective'" because the D. C. courts were "competent to decide all issues"). Even when "*circuit law* is inadequate or deficient" because a Court of Appeals' precedents have resolved a legal issue incorrectly, that is not a fault in "the §2255 remedial vehicle" itself.[4] *Prost*, 636 F. 3d, at 590.

Next, Jones offers a wide-ranging discussion of the concept of "inadequacy" as a term of art in traditional equity jurisprudence. While Jones demonstrates that courts of equity would afford relief from "inadequate" legal remedies in

———————

[4] Despite occasional gestures in its direction, and despite its critical role in persuading the Courts of Appeals to expand the saving clause, Jones' textual arguments place relatively little emphasis on whether binding precedent foreclosed a prisoner's statutory argument at trial, on appeal, and in an initial §2255 motion. See *In re Davenport*, 147 F. 3d 605, 610–611 (CA7 1998) (making such foreclosure an express precondition of saving-clause relief ); see also *Triestman* v. *United States*, 124 F. 3d 361, 380 (CA2 1997) (emphasizing that the prisoner "had no [prior] effective opportunity to raise his [*Bailey*] claim"); *In re Dorsainvil*, 119 F. 3d 245, 251 (CA3 1997) (similar). Rather, under Jones' interpretation of "test," it appears that §2241 would be available to correct *any* asserted error of law by a §2255 court, even on an issue of first impression. Untenable as that consequence is, the erroneous-foreclosure approach fares no better. To hold that binding precedent renders a judicial proceeding "'inadequate or ineffective' to test the rights of parties" would be a shock for "our entire justice system," in which "precedent is ubiquitous." *Wright* v. *Spaulding*, 939 F. 3d 695, 709 (CA6 2019) (Thapar, J., concurring). Nothing in the text or history of the saving clause suggests that it uniquely embodies that far-reaching proposition.

a broad range of circumstances, we find this excursus irrelevant to the question presented here. To the extent that Congress' use of "inadequate" in the saving clause harkens back to equity's historic use of that term (an issue we need not address), the most Jones' evidence proves is that a variety of circumstances might make it impracticable for a prisoner to seek relief *from the sentencing court*. Cf. *Hayman*, 342 U. S., at 215, n. 23. Nothing in Jones' survey of equity jurisprudence, however, even begins to suggest that the saving clause offers an exemption from AEDPA's clear limits on second or successive collateral attacks.

Trying a different tack, Jones suggests that the saving clause's use of the present tense ("is inadequate or ineffective") means that §2241 is available whenever a prisoner is presently unable to file a §2255 motion. Even the Circuits with an expansive view of the saving clause have uniformly rejected this argument, and for good reason. See, *e.g.*, *In re Jones*, 226 F. 3d, at 333; *Dorsainvil*, 119 F. 3d, at 251. Were this argument accepted, AEDPA's changes to §2255 would be entirely futile, as §2241 would be available *any* time the second-or-successive restrictions precluded relief. We decline to infer that Congress intended AEDPA's carefully crafted limits on collateral relief under §2255 to be mere nullities.

As a backstop to his scattershot textual arguments, Jones invokes the constitutional-doubt canon, arguing that denying him the chance to raise his *Rehaif* claim in a §2241 petition raises serious constitutional questions. It does not.[5]

_____

[5] As Court-appointed *amicus curiae* observes, Jones' use of the constitutional-doubt canon is somewhat anomalous, in that it aims at a different result from what a direct constitutional challenge would achieve. If a prisoner persuaded a court that the exclusion of statutory claims from §2255(h) was unconstitutional, the result would not be that he could proceed under §2241, but simply that he could file a second or successive §2255 motion on an equal footing with §§2255(h)(1) and 2255(h)(2) claims.

Jones' primary constitutional argument is that denying him any opportunity to seek postconviction relief based on *Rehaif* would violate the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, §9, cl. 2. This "Suspension Clause argument fails because it would extend the writ of habeas corpus far beyond its scope 'when the Constitution was drafted and ratified.'" *Department of Homeland Security* v. *Thuraissigiam*, 591 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 2) (quoting *Boumediene* v. *Bush*, 553 U. S. 723, 746 (2008)). When the Suspension Clause was adopted, and for a long time afterward, Jones' *Rehaif* claim would not have been cognizable in habeas at all.

At the founding, a sentence after conviction "by a court of competent jurisdiction" was "'in *itself* sufficient cause'" for a prisoner's continued detention. *Brown* v. *Davenport*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 8) (quoting *Ex parte Watkins*, 3 Pet. 193, 202 (1830)). As Chief Justice Marshall explained in the seminal case of *Ex parte Watkins*, the criminal judgment, "in its nature, conclude[d] the subject on which it [was] rendered," "pronounce[d] the law of the case," and "pu[t] an end to the inquiry concerning fact." *Id.*, at 202–203. Of particular relevance here, a habeas court had no power to "look beyond the judgment" to "re-examine the charges on which it was rendered" for substantive errors of law—even "if . . . the [sentencing] court ha[d] misconstrued the law, and ha[d] pronounced an offence to be punishable criminally, which [was] not so." *Id.*, at 202, 209.

In rebuttal, Jones argues that pre-founding practice *did* allow habeas courts to "look beyond the judgment" to ensure that the convicting court had proved every element of the crime for which a prisoner was committed. But Jones fails to identify a single clear case of habeas being used to relitigate a conviction after trial by a court of general criminal

jurisdiction. Rather, the cases he cites mostly involve commitments by justices of the peace,[6] a distinction reflected in *Watkins* itself. See *id.*, at 208 (discussing *Ex parte Burford*, 3 Cranch 448, 453 (1806), where the Court examined on habeas the sufficiency of a warrant of commitment by justices of the peace while noting that no judgment of a federal court was in question). At common law, justices of the peace were not courts of record and did not possess general criminal jurisdiction. *Capital Traction Co.* v. *Hof*, 174 U. S. 1, 16–17 (1899); see also *United States* v. *Mills*, 11 App. D. C. 500, 507 (1897). As such, their commitments were "not placed on the same high ground with the judgments of a court of record," and the fact that superior courts sometimes used habeas to examine commitments by such inferior magistrates furnishes "no authority for inquiring into the judgments of a court of general criminal jurisdiction." *Watkins*, 3 Pet., at 209.

Jones also appeals to *Bushell's Case*, Vaugh. 135, 124 Eng. Rep. 1006 (C. P. 1670), which has long been understood as a case about the independence of criminal juries in determining questions of fact. *Clark* v. *United States*, 289 U. S. 1, 16–17 (1933); see also *Sparf* v. *United States*, 156 U. S. 51, 90–93 (1895); 1 J. Stephen, A History of the Criminal Law of England 375 (1883) (Stephen). There, a judge fined and imprisoned the members of a jury for acquitting William Penn and William Mead on indictments for "assembling unlawfully and tumultuously," a verdict ostensibly against the "manifest evidence." Vaugh., at 137, 124 Eng. Rep., at 1007. A juror refused to pay the fine, applied to the

_____

[6] See *Rex* v. *Brown*, 8 T. R. 26, 101 Eng. Rep. 1247 (1798); *Rex* v. *Hall*, 1 Cowp. 60, 98 Eng. Rep. 967 (1774); *Rex* v. *Hall*, 3 Burr. 1636, 97 Eng. Rep. 1022 (1765); *Rex* v. *Collier*, 1 Wils. K. B. 332, 95 Eng. Rep. 647 (1752). The cursory report in *Rex* v. *Catherall*, 2 Str. 900, 93 Eng. Rep. 967 (1730), is silent as to the authority under which the petitioner was convicted, and so cannot help Jones overcome *Watkins*.

Court of Common Pleas for a writ of habeas corpus, and obtained discharge in an opinion by Chief Justice Vaughn. Jones points to one part of Vaughn's opinion, which criticized the return of the writ for not specifying that the jurors "kn[e]w and believe[d] th[e] evidence to be full and manifest against the indicted persons," without which the jurors' verdict was "no cause of fine or imprisonment." *Id.*, at 142, 124 Eng. Rep., at 1009. Jones asks us to read this passage as reflecting a supposed common-law rule that habeas relief was available whenever a convicting court had not found the necessary *mens rea* of a crime. That reading, however, entirely misses the actual basis of Vaughn's opinion, which was the judge's absolute *want of power* to question the jury's determination of the facts. See *id.*, at 149, 124 Eng. Rep., at 1013 ("It is absurd a jury should be fined by the Judge for going against their evidence, when he who fineth knows not what it is . . . . [I]f it be demanded, what is the fact? the Judge cannot answer it"); see also Stephen 375 ("[T]he judges who heard the argument . . . decided that the discretion of the jury to believe the evidence or not could not be questioned"). Thus, *Bushell's Case* no more undermines *Watkins* than do the justice-of-the-peace cases.

The principles of *Watkins* guided this Court's understanding of the habeas writ throughout the 19th century and well into the 20th. See *Brown*, 596 U. S., at \_\_\_, n. 1 (slip op., at 9, n. 1) (collecting cases); see also *Johnson* v. *Zerbst*, 304 U. S. 458, 465–466 (1938). Even in *Ex parte Siebold*, 100 U. S. 371 (1880), which held that the constitutionality of a prisoner's statute of conviction could be reviewed on habeas (as going to jurisdiction),[7] the Court

_____

[7] The Court seemingly abandoned that notion in *Glasgow* v. *Moyer*, 225 U. S. 420 (1912), which explained that "[t]he principle" that nonjurisdictional errors of substantive law are not cognizable in habeas "is not the less applicable because the law which was the foundation of the indictment and trial is asserted to be unconstitutional . . . . [I]f a court has jurisdiction of the case the writ of *habeas corpus* cannot be employed to

acknowledged *Watkins* and took pains to reconcile its hold-
ing with the traditional rule. See 100 U. S., at 375–377.
And, when asked to review convicting courts' substantive
errors of *statutory* law in habeas corpus proceedings, this
Court consistently held that it could not do so.[8] It was not

————————

re-try the issues, whether of law, *constitutional or otherwise*, or of fact."
*Id.*, at 429 (emphasis added).

    [8] See, *e.g.*, *Knewel* v. *Egan*, 268 U. S. 442, 446 (1925) ("It is fundamen-
tal that a court upon which is conferred jurisdiction to try an offense has
jurisdiction to determine whether or not that offense is charged or
proved"); *In re Gregory*, 219 U. S. 210, 213 (1911) ("[W]e are not con-
cerned with the question whether the information was sufficient or
whether the acts set forth in the agreed statement constituted a crime,
that is to say, whether the court properly applied the law, if it be found
that the court had jurisdiction to try the issues and to render the judg-
ment"); *In re Eckart*, 166 U. S. 481, 483 (1897) (explaining that habeas
would not offer relief from "a trial and conviction upon an indictment,
the facts averred in which are asserted to be insufficient to constitute an
offence against the statute claimed to have been violated"); *Ex parte Yar-
brough*, 110 U. S. 651, 654 (1884) ("Whether the indictment sets forth in
comprehensive terms the offence which the statute describes and forbids
. . . is in every case a question of law . . . within [the trial court's] juris-
diction"); *Ex parte Parks*, 93 U. S. 18, 20–21 (1876) ("It would be an as-
sumption of authority for this court, by means of the writ of *habeas cor-
pus*, to review every case in which the defendant attempts to controvert
the criminality of the offence charged in the indictment").

    Ignoring this authority, JUSTICE JACKSON's dissent cites a handful of
inapposite cases to suggest that 19th-century American courts would
have treated claims such as Jones' as cognizable in habeas. See *post*, at
31–32, n. 19, 34, 36–37, n. 25. *Grant* v. *United States*, 58 F. 694 (CA9
1893), was a case on a writ of error, not habeas corpus. *Ex parte D'Oli-
vera*, 7 F. Cas. 853 (No. 3,967) (CC Mass. 1813), was another justice-of-
the-peace case. *Ex parte Randolph*, 20 F. Cas. 242, 254 (No. 11,558) (CC
Va. 1833), involved detention unsupported by any "judgment" or "judicial
process" whatsoever. *United States* v. *Bainbridge*, 24 F. Cas. 946 (No.
14,497) (CC Mass. 1816), involved a collateral attack on a sentence im-
posed by a naval court martial; Justice Story's opinion turned on the va-
lidity of the petitioner's contract of enlistment, which, in turn, went to
the court martial's jurisdiction. *Id.*, at 949–952; see also *Ex parte Wat-
kins*, 3 Pet 193, 209 (1830); *Wise* v. *Withers*, 3 Cranch 331, 337 (1806).
*Ex parte Bollman*, 4 Cranch 75 (1807), relieved two alleged traitors from

until 1974, in *Davis*, that the Court broke with that tradition, holding for the first time that a substantive error of statutory law could be a cognizable ground for a collateral attack on a federal court's criminal judgment.  See 417 U. S., at 342–347.

The Suspension Clause does not constitutionalize that innovation of nearly two centuries later.  Nor, *a fortiori*, does it require the extension of that innovation to a second or successive collateral attack.

Jones' remaining constitutional arguments are no more persuasive.  He argues that denying him a new opportunity for collateral review of his *Rehaif* claim threatens separation-of-powers principles—specifically, Congress' exclusive power to define crimes  Cf. *United States* v. *Hudson*, 7 Cranch 32, 34 (1812).  But the authority to determine the facts and the law in an individual case, and to render a final, binding judgment based on those determinations, stands at the core of the judicial power.  See *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 218–219 (1995); *Watkins*, 3 Pet., at 202–203.  A court does not usurp legislative power simply by misinterpreting the law in a given case.  See *id.*, at 206 ("If its judgment was erroneous, a point which this court does not determine, still it is a judgment").

––––––––––

pretrial orders of commitment on the ground that there was "not sufficient evidence . . . to justify [their] commitment on the charge of treason." *Id.*, at 135.  *Matter of Corryell*, 22 Cal. 178 (1863), granted relief from a pretrial order of commitment after holding that the acts of which the petitioner stood accused did not constitute the charged crime.  *Id.*, at 180, 183.  (Incidentally, this use of habeas was not free from controversy.  See, *e.g.*, *In re Hacker*, 73 F. 464, 465–469 (SD Cal. 1896); "*In re Kearney*," The Writ of Habeas Corpus—Its Uses and Abuses, 5 Pac. Coast L. J. 549, 565–570 (1880).)  Finally, *In re Wahll*, 42 F. 822 (D. Minn. 1890), considered but rejected a similar argument for ordering pretrial release.  *Id.*, at 824–826.  In sum, like Jones' pre-founding English cases, the dissent's 19th-century American cases include no example in which a prisoner under sentence of a court of general criminal jurisdiction was permitted to relitigate the elements of his offense on habeas corpus.

Next, Jones points to *Fiore* v. *White*, 531 U. S. 225 (2001) (*per curiam*), which applied the rule that due process requires that the prosecution prove every element of a crime beyond a reasonable doubt. See *id.*, at 228–229. Whether a due process error has occurred *at trial*, however, is an entirely different issue from Congress' power to restrict collateral review. Due process does not guarantee a direct appeal, *McKane* v. *Durston*, 153 U. S. 684, 687 (1894), let alone the opportunity to have legal issues redetermined in successive collateral attacks on a final sentence.

Jones' last constitutional contention—that the Eighth Amendment's prohibition on cruel and unusual punishments may entitle him to another round of collateral review—fails for a similar reason. By its terms, the Cruel and Unusual Punishments Clause expresses a substantive constraint on the kinds of punishments governments may "inflic[t]." It creates no freestanding entitlement to a second or successive round of postconviction review, and thus it adds nothing to Jones' unavailing Suspension Clause argument.

## B

The Government agrees with the Eighth Circuit that Jones is not entitled to relief, but, somewhat surprisingly, it asks us to adopt a novel, alternative interpretation of the saving clause, which it constructs via a roundabout argument. It begins with the premise that the words "inadequate or ineffective" imply reference to a "benchmark" of adequacy and effectiveness. It proceeds to identify that benchmark as the ability to test the types of claims cognizable under the general habeas statutes—specifically, those governing federal habeas petitions by *state* prisoners. The Government then reasons that §2255(h)'s limitations on second or successive motions asserting newly discovered evidence or new rules of constitutional law do not trigger the

saving clause because Congress has imposed analogous limitations on analogous claims by state prisoners and—by doing so—has *redefined* §2255(e)'s implicit habeas benchmark with respect to such "factual" and "constitutional" claims. See 28 U. S. C. §§2244(b)(2)(A)–(B). Since, the Government asserts, Congress has imposed no analogous limitation on statutory claims by state prisoners, it has not redefined the implicit habeas benchmark with respect to statutory claims like Jones'. And, we should be unwilling to infer that AEDPA limited such claims without a clearer textual indication. The Government concludes that §2255(h) renders §2255 "inadequate or ineffective to test" a federal prisoner's statutory claim in cases where the prisoner has already filed one §2255 motion and the claim otherwise satisfies pre-AEDPA habeas principles, which generally will require "a 'colorable showing of factual innocence.'" *McCleskey* v. *Zant*, 499 U. S. 467, 495 (1991) (quoting *Kuhlmann* v. *Wilson*, 477 U. S. 436, 454 (1986) (plurality opinion)).[9]

---

[9] The Government also argues that *Davis* v. *United States*, 417 U. S. 333 (1974), and *Sunal* v. *Large*, 332 U. S. 174 (1947), read together, dictate that only an intervening decision of *this* Court, rather than a Court of Appeals, can work such a change in the law as to justify an otherwise-barred §2241 petition. But this attempt to articulate an additional limiting principle for the Government's theory requires turning the cases inside out. In *Davis*, where this Court allowed a statutory claim to proceed under §2255, the relevant narrowing decision came from the Ninth Circuit. See 417 U. S., at 341 (discussing *United States* v. *Fox*, 454 F. 2d 593 (CA9 1971)). In *Sunal*, where two petitioners' statutory claims were barred from proceeding in habeas, it was this Court that had issued the relevant decision. See 332 U. S., at 176 (discussing *Estep* v. *United States*, 327 U. S. 114 (1946)). As we have recognized, see *Reed* v. *Farley*, 512 U. S. 339, 354 (1994), the holding of *Sunal* rested on what we would today call the petitioners' procedural default without cause: By not appealing their convictions, they had forfeited the argument that ended up prevailing in *Estep*, and they had shown no "exceptional circumstances which excuse[d] their failure" to appeal. 332 U. S., at 183–184. The *Sunal* Court thus had no occasion to definitively resolve whether the petitioners' claims would have been cognizable in habeas but for their de-

This elaborate theory is no more convincing than Jones' arguments. Its most striking flaw is the seemingly arbitrary linkage it posits between the saving clause and state prisoners' statutory postconviction remedies. While it is true that §2255, as enacted, afforded the same rights *federal* prisoners previously enjoyed under the general habeas statutes, see *Hayman*, 342 U. S., at 219, nothing in §2255's text, structure, or history suggests that Congress intended any part of it to implicitly cross-reference whatever modifications to *state* prisoners' postconviction remedies might be made in the future. Understanding the saving clause to do so would have highly counterintuitive implications: On the Government's view, §§2255(h)(1) and (h)(2) do not create an adequacy or effectiveness problem *only because of* the parallel state-prisoner provisions in §2244(b). It seems to follow that if Congress relaxed §2244(b)'s second-or-successive restrictions for state prisoners tomorrow, and did nothing else, §2255 would suddenly become "inadequate or ineffective to test" at least some second or successive fact-based claims that did not satisfy §2255(h)(1) or constitutional claims that did not satisfy §2255(h)(2), and that those claims would then be allowed to proceed under §2241. We see no indication that the spare language of the saving clause creates such a Rube Goldberg contrivance, whereby changes to other statutory provisions (which do not apply to federal prisoners at all) could flow back into §2255 and undermine §2255(h).

In any event, as the Government acknowledges, a state prisoner could never bring a pure statutory-error claim in federal habeas, because "'federal habeas corpus relief does

_____

fault. And, to the extent *Sunal* addressed that question in dicta, it appeared to be of two minds. See *id.*, at 181–183 (suggesting, in a single unelaborated sentence, that the petitioners' "cases would be quite different" had they appealed and lost, then spending two paragraphs emphasizing that the trial courts' "error of law" was neither jurisdictional nor constitutional).

not lie for errors of state law.'" *Estelle* v. *McGuire*, 502 U. S. 62, 67 (1991) (quoting *Lewis* v. *Jeffers*, 497 U. S. 764, 780 (1990)). As a result, it is unclear what work the Government's state-prisoner-habeas benchmark is even doing in its answer to the question presented here.

Rather, the narrow base on which the Government's top-heavy theory ultimately turns out to rest is its assertion that §2255(h) is simply *not clear enough* to support the inference that Congress entirely closed the door on pure statutory claims not brought in a federal prisoner's initial §2255 motion. See Brief for Respondent 28–29, 39. That assertion is unpersuasive for the reasons we have already explained: §2255(h) specifies the two circumstances in which a second or successive collateral attack on a federal sentence is available, and those circumstances do not include an intervening change in statutory interpretation.

The Government asserts that we require "the clearest command" before construing AEDPA to "close [the] courthouse doors" on "a strong equitable claim" for relief. *Holland* v. *Florida*, 560 U. S. 631, 646, 649 (2010) (internal quotation marks omitted). The only two cases the Government relies on for its clear-statement rule do not sweep as broadly as it suggests. In *Holland*, we applied the general presumption of equitable tolling to AEDPA's 1-year statute of limitations for state prisoners' habeas claims. *Id.*, at 645–649. Afterward, in *McQuiggin* v. *Perkins*, 569 U. S. 383 (2013), we held that "a convincing showing of actual innocence" could enable a prisoner to evade AEDPA's statute of limitations entirely. *Id.*, at 386.

Undoubtedly, *McQuiggin*'s assertion of equitable authority to override clear statutory text was a bold one. But even taking *Holland* and *McQuiggin* for all they are worth, there is a significant difference between reading equitable exceptions into a statute of limitations, on the one hand, and demanding a clear statement before foreclosing workarounds to AEDPA's second-or-successive restrictions, on the other.

Statutes of limitations merely govern the *timeframe* for bringing a claim. AEDPA's second-or-successive restrictions, by contrast, "constitute a modified res judicata rule," *Felker* v. *Turpin*, 518 U. S. 651, 664 (1996), and thus embody Congress' judgment regarding the central policy question of postconviction remedies—the appropriate balance between finality and error correction. Insisting on a heightened standard of clarity in this context would effectively mean adopting a presumption against finality as a substantive value. We decline to do so. "[T]he United States has an interest in the finality of sentences imposed by its own courts," *Johnson* v. *United States*, 544 U. S. 295, 309 (2005), and how to balance that interest against error correction is a "judgmen[t] about the proper scope of the writ" that is "'normally for Congress to make.'" *Felker*, 518 U. S., at 664 (quoting *Lonchar* v. *Thomas*, 517 U. S. 314, 323 (1996)).

Accepting the Government's proposal to apply a clear-statement rule would be particularly anomalous in light of the precise question this case presents. Typically, we find clear-statement rules appropriate when a statute implicates historically or constitutionally grounded norms that we would not expect Congress to unsettle lightly. See, *e.g.*, *Alabama Assn. of Realtors* v. *Department of Health and Human Servs.*, 594 U. S. ___, ___ (2021) (*per curiam*) (slip op., at 6) (presumption that Congress does not casually assign executive agencies "powers of vast economic and political significance" or "significantly alter the balance between federal and state power" (internal quotation marks omitted)); *Landgraf* v. *USI Film Products*, 511 U. S. 244, 265–266 (1994) (presumption against statutory retroactivity); *Atascadero State Hospital* v. *Scanlon*, 473 U. S. 234, 243 (1985) (presumption against abrogation of state sovereign immunity). But, as shown above in discussing Jones' Suspension Clause argument, there is no historical or constitutional norm of permitting one convicted of a crime by a court of

competent jurisdiction to collaterally attack his sentence based on an alleged error of substantive statutory law. As far as history and the Constitution are concerned, "there is nothing incongruous about a system in which this kind of error—the application of a since-rejected statutory interpretation—cannot be remedied after final judgment." *George* v. *McDonough*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 10). *A fortiori*, there is nothing fundamentally surprising about Congress declining to make such errors remediable in a *second or successive* collateral attack.

## IV

We affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 21–857

———————

## MARCUS DEANGELO JONES, PETITIONER *v.* DEWAYNE HENDRIX, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 22, 2023]

JUSTICE SOTOMAYOR and JUSTICE KAGAN, dissenting.

We respectfully dissent. As JUSTICE JACKSON explains, today's decision yields disturbing results. See *post*, at 23–25 (dissenting opinion). A prisoner who is actually innocent, imprisoned for conduct that Congress did not criminalize, is forever barred by 28 U. S. C. §2255(h) from raising that claim, merely because he previously sought postconviction relief. It does not matter that an intervening decision of this Court confirms his innocence. By challenging his conviction once before, he forfeited his freedom.

Though we agree with JUSTICE JACKSON that this is not the scheme Congress designed, we see the matter as the Solicitor General does. As all agree, Congress enacted §2255 to "afford federal prisoners a remedy identical in scope to federal habeas corpus." *Davis* v. *United States*, 417 U. S. 333, 343 (1974). To ensure that equivalence, Congress built in a saving clause, allowing recourse to habeas when the "remedy by motion" under §2255 is "inadequate or ineffective" compared to the remedy it replaced: an "application for a writ of habeas corpus." §2255(e). So, as this Court has explained, if §2255 bars a claim cognizable at habeas, such that the remedies are not "commensurate," the saving clause kicks in, and the prisoner may "proceed in federal habeas corpus." *Sanders* v. *United States*, 373 U. S. 1, 14–15 (1963); see *United States* v. *Hayman*, 342 U. S. 205, 223

(1952).

With that understanding in mind, consider a prisoner who, having already filed a motion for postconviction relief, discovers that a new decision of this Court establishes that his statute of conviction did not cover his conduct. He is out of luck under §2255, because §2255(h) will bar his claim. But that claim is cognizable at habeas, where we have long held that federal prisoners can collaterally attack their convictions in successive petitions if they can make a colorable showing that they are innocent under an intervening decision of statutory construction. See *Davis*, 417 U. S., at 344–347; *McCleskey* v. *Zant*, 499 U. S. 467, 493–495 (1991). Congress did not abrogate that principle in §2255(h). Thus, we have precisely the kind of mismatch the saving clause was designed to address.

In this case, the petitioner says he is that prisoner, with that mismatch. But the Court of Appeals never considered that question, laboring under a mistaken view of the saving clause that, like the majority's, assigns it almost no role. Accordingly, we would remand for the lower courts to consider the petitioner's claim under the proper framework. See *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005).

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–857

_____

## MARCUS DEANGELO JONES, PETITIONER *v.* DEWAYNE HENDRIX, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 22, 2023]

JUSTICE JACKSON, dissenting.

Today, the Court holds that an incarcerated individual who has already filed one postconviction petition cannot file another one to assert a previously unavailable claim of statutory innocence.[1]  The majority says that result follows from a "straightforward" reading of 28 U. S. C. §2255. *Ante*, at 10, 12.  But the majority reaches this preclusion decision by "negative inference." *Ante*, at 10.  And it is far from obvious that §2255(h)'s bar on filing second or successive postconviction petitions (with certain notable exceptions) prevents a prisoner who has previously sought postconviction relief from bringing a newly available legal innocence claim in court.  See Part II, *infra.*

In any event, putting aside its questionable interpretation of §2255(h), the majority is also wrong to interpret §2255(e)—known as the saving clause—as if Congress designed that provision to filter potential habeas claims through the narrowest of apertures, saving essentially only those that a court literally would be unable to consider due to something akin to a natural calamity.  See Part I, *infra.*  This stingy characterization does not reflect a primary aim

_____

[1] I use the terms "statutory innocence" and "legal innocence" in this opinion interchangeably.  Both refer to a situation where an individual was convicted under a statute that, properly interpreted, did not reach his conduct.

of §2255(e), which was to "save" any claim that was available prior to §2255(h)'s enactment where Congress has not expressed a clear intent to foreclose it. Jones's legal innocence claim fits that mold.

I am also deeply troubled by the constitutional implications of the nothing-to-see-here approach that the majority takes with respect to the incarceration of potential legal innocents. See Part III, *infra.* Apparently, legally innocent or not, Jones must just carry on in prison regardless, since (as the majority reads §2255) no path exists for him to ask a federal judge to consider his innocence assertion. But forever slamming the courtroom doors to a possibly innocent person who has never had a meaningful opportunity to get a new and retroactively applicable claim for release reviewed on the merits raises serious constitutional concerns.

Thus, in my view, all roads lead to an interpretation of §2255 that is diametrically opposed to the one that the majority announces. Whether one gets there by virtue of a proper reading of §2255(e) or an informed understanding of §2255(h), or by affording due respect to the core constitutional interests at stake, Jones's successive petition alleging legal innocence should have been considered on the merits.[2] Therefore, I respectfully dissent.

I

Section 2255(e) saves postconviction claims by authorizing the filing of a habeas petition under §2241 if the procedures §2255 affords are "inadequate or ineffective to test the legality of [a prisoner's] detention." §2255(e). I see no reason why the *only* circumstance in which §2255's procedures qualify as inadequate or ineffective for saving clause purposes is when it is impossible or impractical for a prisoner to file a §2255 motion. Contra, *ante*, at 6–7. Quite to

_____

[2] I take no position as to whether Jones's legal innocence claim is actually meritorious. This case is about whether §2255 should be interpreted to prevent him from bringing the claim to a court in the first place.

the contrary, the enactment history of §2255 plainly establishes that Congress wanted to ensure that a prisoner's claim was "saved" in at least one additional set of circumstances: Where the prisoner would have been able to bring such a claim prior to the enactment of §2255 (or any subsequent changes, like those made by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)), but somehow cannot bring that claim after a change to the statutory framework (unless Congress has clearly expressed its intent to restrict the scope of relief in that regard). As the majority has interpreted §2255(h), that is precisely the situation here.

### A

To understand why Congress meant for Jones to be able to invoke the saving clause and bring his statutory innocence claim in a habeas petition filed under §2241, a firm grasp of the text, history, and intended operation of §2255(e) is required.

### 1

The saving clause is the latter part of §2255(e), which states in full:

> "An application for a writ of habeas corpus [o]n behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, *unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention.*" §2255(e) (emphasis added); see also §2255 (1946 ed., Supp. II) (§2255 (1948)).

Before §2255 was enacted in 1948, federal prisoners collaterally attacked their convictions by filing a habeas petition. See *United States* v. *Hayman*, 342 U. S. 205, 210–213

(1952). Such petitions sought judicial review of the legality of the individual's detention, and were filed in the district where the person was incarcerated. *Ibid.* This led to some problems: Districts that housed large federal prisons were disproportionately burdened with habeas petitions. *Id.*, at 213–214. Also, in many cases, the court deciding the petition was both unfamiliar with the underlying facts and far away from the relevant record, evidence, and witnesses. *Ibid.*

Congress created §2255—an entirely new process for federal prisoners to use when seeking postconviction judicial review—to solve these practical problems. *Ante*, at 5–6. Under the procedures laid out in §2255, in lieu of filing a traditional habeas petition, federal prisoners must file a §2255 motion. And any such motion is to be filed in the sentencing court, not in the district of confinement. §2255(a) (2018 ed.); see *Hayman*, 342 U. S., at 219.

Congress crafted (what is now) §2255(e) to ensure that the new §2255 procedure successfully ousted the outdated habeas regime it replaced. Per the first part of that provision, as a general matter, §2255 becomes the exclusive procedure by which federal prisoners can collaterally attack their convictions. See §2255(e) (providing that "[a]n application for a writ of habeas corpus . . . shall not be entertained" where, in essence, the prisoner fails to bring an authorized §2255 motion, or does so and is denied relief ). Yet Congress also specified that, in a circumstance in which §2255 is "inadequate or ineffective to test the legality of his detention," an individual *could* still file a habeas petition. *Ibid.*

There are multiple ways in which §2255 might be "insufficient" or "[n]ot capable of performing the required work" of postconviction review of federal convictions. Webster's New International Dictionary 1254, 1271 (2d ed. 1934) (defining "inadequate" and "ineffective" in this manner); see

also Funk & Wagnalls New Standard Dictionary of the English Language 1239, 1255 (1942) (similar). For example, §2255 would not be up to the task if it would be impossible or impracticable for a federal prisoner to file a §2255 petition. *Ante*, at 6, 11.

The case before us involves another way that §2255 can be inadequate or ineffective—where the newly created §2255 procedure, perhaps inadvertently, blocks a prisoner from bringing a claim that was previously cognizable in habeas. This is an inadequacy concerning the operation of §2255 from Congress's perspective, because the "sole purpose" of §2255 "was to minimize the difficulties encountered in habeas corpus hearings" while still "affording *the same rights* in another and more convenient forum." *Hayman*, 342 U. S., at 219 (emphasis added); see also *Davis* v. *United States*, 417 U. S. 333, 343 (1974) ("Th[e] history makes clear that §2255 was intended to afford federal prisoners a remedy *identical in scope* to federal habeas corpus" (emphasis added)); *Sanders* v. *United States*, 373 U. S. 1, 14 (1963) ("[I]t conclusively appears from the historic context in which §2255 was enacted that the legislation was intended simply to provide in the sentencing court a remedy *exactly commensurate* with that which had previously been available by habeas corpus" (emphasis added; internal quotation marks omitted)).

That much is not in dispute—the majority acknowledges that Congress intended to maintain equivalence with the claims available in habeas when it enacted §2255. See *ante*, 5–6. Consequently, in any circumstance in which the new §2255 procedure actually operates to foreclose a postconviction claim that a prisoner could have brought previously in a habeas petition, the §2255 process is patently inadequate to accomplish Congress's aim of allowing prisoners to test the legality of their detention under §2255 to the same extent as they could have in the habeas regime that §2255 replaced.

Thus, the saving clause can be properly interpreted as effectuating Congress's intent in this regard. As the Government persuasively argues, by inserting a provision that allows prisoners to still file habeas petitions, Congress "ensure[d] that Section 2255 does not disadvantage federal prisoners as compared to habeas." Brief for Respondent 17; see also *Boumediene* v. *Bush*, 553 U. S. 723, 776 (2008) (noting that the purpose of §2255 was "to strengthen, rather than dilute, the writ's protections" and further recognizing that the saving clause served that purpose). That is, where a federal prisoner could have brought a particular habeas claim prior to 1948, but could not bring such a claim in a §2255 petition after that date, the saving clause kicks in to permit that individual to resort to habeas to raise that claim.

This reading of §2255(e) means that the saving clause operates (at the very least, and as it was enacted in 1948) to preserve from inadvertent extinguishment postconviction claims that would have been previously cognizable for federal prisoners but cannot be brought by operation of §2255. And the flip side of that interpretation—that §2255 is inadequate or ineffective if it *sub silentio* extinguishes previously available habeas claims, triggering the saving clause—inexorably follows. This interpretation tracks Congress's clear claim-preservation goal. And, as an added bonus, it also has the benefit of being in accordance with how saving clauses usually work. See 2 J. Sutherland, Statutory Construction §4830, pp. 376–377 (3d ed. 1943) (defining "saving clause" as a provision "said to preserve from destruction certain rights, remedies or privileges which would otherwise be destroyed by the general enactment"); see, *e.g.*, *Andrus* v. *Shell Oil Co.*, 446 U. S. 657, 666 (1980) (noting that Congress included a "savings clause" in the statute at issue to "preserv[e] pre-existing claims"); *United States* v. *Menasche*, 348 U. S. 528, 535 (1955) (noting that the purpose of a saving clause in the immigration context was to

"manifes[t] a well-established congressional policy not to strip [noncitizens] of advantages gained under prior laws").

2

Fast forward to 1996: Congress reenacted the saving clause—using identical language—when it passed AEDPA. §2255(e); §2255 (1948). Thus, because the saving clause operated in 1948 to "save" from inadvertent extinguishment habeas claims that were available before the enactment of §2255, the same was true when Congress revised those procedures in the mid-1990s, while keeping the saving clause intact. In other words, both in 1948 and to this day, the saving clause operates to (among other things) ensure that §2255—or the AEDPA amendments—did not, through inapt language, substantively alter the scope of available postconviction relief for federal prisoners.

This is not to say that Congress necessarily carried forward all of its previous policy determinations with respect to the availability of postconviction claims, or that it did not change its mind at all about the appropriate dimensions of postconviction relief. Indeed, habeas is a dynamic remedy, and congressional enactments contribute to its evolution. See *Felker* v. *Turpin*, 518 U. S. 651, 664 (1996); see also 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §28.4[a], p. 1738 (7th ed. 2020) (Hertz & Liebman) ("Anglo-American law . . . has imposed an evolving set of restrictions on second and subsequent petitions"). But, again, the saving clause—which served an important equalizing function—remained intact when Congress reenacted §2255 in 1996. Thus, while Congress can certainly act to change the scope of habeas or its statutory equivalent if it wants to do so, in order to overcome the operation of the saving clause (which, again, was inserted to maintain equivalence in the absence of intent to make a change), Congress has to make said change to the availability of

postconviction relief deliberately and clearly, thereby une-
quivocally expressing its intent to do so. See *Holland* v.
*Florida*, 560 U. S. 631, 646 (2010); *infra*, at 25–28.

All this means that today (as in 1948) the saving clause
is best interpreted as allowing for the filing of a habeas pe-
tition under §2241 where a claim that was cognizable prior
to AEDPA cannot be brought under §2255, unless Congress
has clearly expressed its intent to foreclose that particular
claim.

### B

That brings us to the situation at issue here. When Con-
gress amended §2255 by enacting AEDPA, it legislated
against a legal background in which a federal prisoner
could bring a statutory innocence claim in a §2255 petition.
The majority does not dispute this. See *ante*, at 18–19. Nor
could it, because this Court made crystal clear in 1974 in
*Davis* that statutory innocence claims are legally cogniza-
ble in a §2255 motion. 417 U. S., at 343–347.[3]

Moreover, prior to AEDPA's enactment, a federal pris-
oner could bring such a postconviction claim of statutory in-
nocence *in a successive petition*. This Court had generally
restricted successive postconviction filings by the 1990s,
but a prisoner who had previously filed at least one petition
could still file another one in order to assert innocence.
That was because any bar to the filing of a successive peti-
tion was typically lifted if enforcing that bar would result
in a "miscarriage of justice." *McCleskey* v. *Zant*, 499 U. S.
467, 494–495 (1991); Hertz & Liebman §28.4[g], at 1757;
see Brief for Respondent 22–24. And under our settled

---

[3] In this regard, *Davis* merely acknowledged what had been true since
the founding. See *infra*, at 31–34; *Davis* v. *United States*, 417 U. S. 333,
343–345 (1974); see also L. Litman, Legal Innocence and Federal Ha-
beas, 104 Va. L. Rev. 417, 488, n. 334 (2018) ("[A]t the time Section 2255
was enacted, federal prisoners could raise a claim, in successive peti-
tions, that they were mistakenly convicted or sentenced because of an
error of statutory interpretation").

precedent, legal innocence claims fit that category. See *Davis*, 417 U. S., at 346 ("There can be no room for doubt" that "conviction and punishment . . . for an act that the law does not make criminal" "'inherently results in a complete miscarriage of justice'"); see also *Bousley* v. *United States*, 523 U. S. 614, 623–624 (1998).

These background principles relate to the successive petition that Jones seeks to bring here as follows. If the majority is right that (by virtue of §2255(h)) prisoners like Jones are now unable to bring a successive §2255 petition to make the same kind of legal innocence claim that they could have brought prior to AEDPA, then Congress's enactment of §2255(h) has dramatically altered the legal landscape in a manner that seems, at best, inconsistent with its original intent. To repeat: The saving clause expresses a congressional intent to maintain *equivalence* between what a prisoner could claim before and after §2255(h); yet under the majority's reading, §2255(h)'s "second or successive" bar would effectively operate to preclude successive legal innocence claims—*shrinking* the universe of previously available claims—the opposite of what Congress set out to do when it set up §2255.

In my view, that is where the saving clause comes in. Reading the saving clause to perform its normal, intended function of "saving" previously available claims solves this problem, because it allows prisoners who could have brought a claim prior to the enactment of AEDPA (like Jones) to file a habeas petition to the extent that §2255 now precludes such a filing under that particular statutory mechanism. Thus, interpreting §2255(e)'s "inadequate and ineffective" language to permit the filing of a habeas petition that raises a legal innocence claim in these circumstances seems perfectly consistent with Congress's intent.

This understanding of the saving clause also explains the clause's application—or, more precisely, its *inapplicability*—to the types of claims specifically mentioned in

§§2255(h)(1) and (2). Congress has expressly overridden operation of the saving clause with respect to those two provisions, because it has clearly expressed its intent to narrow the scope of postconviction relief where a federal prisoner brings a successive petition raising a claim of new evidence or new constitutional law.[4] "A legislature may adopt a policy different from that embodied in the general saving statute." M. Ruud, The Savings Clause—Some Problems in Construction and Drafting, 33 Texas L. Rev. 285, 299 (1955). And here, no one questions that, with §§2255(h)(1) and (2), Congress clearly did so. Brief for Respondent 26–28. But the majority now reasons that, merely by omitting statutory innocence claims from that authorized-filings list, Congress should be deemed to have exhibited a narrowing intent with respect to those claims as well. See *ante*, at 1–2, 12.

I disagree. Indeed, in my view, it is precisely because the text of §§2255(h)(1) and (2) speaks unequivocally to the narrowing Congress wished to effect with respect to new-evidence and new-constitutional claims that we should *not* ascertain that Congress meant for the second or successive bar to have the same effect with respect to legal innocence

––––––––

[4] Prior to AEDPA, an individual who wished to file a successive petition claiming factual innocence on the basis of new evidence needed only to show that it was "more likely than not" that the jury would have acquitted him. *Schlup* v. *Delo*, 513 U. S. 298, 327 (1995). But, with AEDPA, Congress narrowed the scope of available relief for factual innocence claims by requiring prisoners to make their showing by the more stringent "clear and convincing evidence" standard. §2255(h)(1); see also §2244(b)(2)(B)(ii); 141 Cong. Rec. 15040, 15042 (1995) (statement of Sen. Levin). Similarly, before AEDPA, an intervening change of *circuit* precedent arguably could warrant a successive petition raising a new constitutional argument. See *Davis*, 417 U. S., at 339–341, 346–347; *Sanders* v. *United States*, 373 U. S. 1, 17 (1963); *United States* v. *Nolan*, 571 F. 2d 528, 530 (CA10 1978); see also Hertz & Liebman §28.3[c][ii], at 1709–1710, and n. 108. Yet AEDPA permits successive petitions raising new constitutional claims only when premised on retroactive *Supreme Court* opinions. §§2255(h)(2), 2244(b)(2)(A).

claims—which, importantly, the statute does not mention.
To put it bluntly: Congress knows how to speak clearly
when it wants to disrupt the continuity of claims that are
available to prisoners before and after it enacts legislation
that addresses postconviction review procedures. And ra-
ther than providing any such clear statement as to how an
intervening claim of statutory innocence should be treated
vis-à-vis §2255(h)'s second or successive bar, Congress was
conspicuously silent.[5]

### C

The majority advances an entirely different theory of the
work that §2255(e) does with respect to the postconviction
review scheme—a theory that I do not find even remotely
persuasive. Opting for the narrowest possible view of Con-
gress's intent regarding the saving clause, the majority gen-
erally claims that the saving clause only authorizes the fil-
ing of a habeas petition if filing a §2255 motion would be
"impossible or impracticable." *Ante*, at 6, 11. And in the
majority's telling, that circumstance only occurs, say, if the
courthouse where a §2255 motion would have otherwise
been filed has burned to the ground or been carried away

─────────

[5] The text of §2255(h) says nothing about legal innocence claims, let
alone clearly expresses an intent to narrow the scope of available post-
conviction relief for that category of claims, in contrast to what the stat-
ute says about claims of new evidence or new constitutional rules. Con-
gress could have easily stated somewhere in §2255(h) or §2244 that "no
circuit or district judge shall be required to consider a second or succes-
sive motion premised only on statutory claims, even claims suggesting
innocence," or that "a court of appeals shall not certify or authorize a
second or successive §2255 petition that raises a statutory claim only."
Yet nothing close to this kind of language, or distinction, appears on the
face of the statute. Nor does an intent to foreclose statutory innocence
claims appear in the legislative history of §2255(h), even though that his-
tory *does* clearly reflect a congressional intent to narrow the scope of
postconviction relief for the categories expressly mentioned in
§§2255(h)(1) and (2) (like new evidence claims), see, *e.g.*, 141 Cong. Rec.,
at 15040, 15042 (statement of Sen. Levin).

by a mudslide.  The majority's parsimonious perspective on the meaning of "inadequate or ineffective" is flawed in many respects.

First and foremost, it is entirely atextual.  The majority cites exactly zero dictionary definitions of the terms "inadequate" or "ineffective."  And while it does reference an earlier draft of the legislation that became §2255, *ante*, at 7 (quoting *Hayman*, 342 U. S., at 215, n. 23), it fails to mention that Congress specifically *rejected* language that embraced the majority's "impracticable only" proposition.  See *Hayman*, 342 U. S., at 215, n. 23; *In re Dorsainvil*, 119 F. 3d 245, 250 (CA3 1997).

Furthermore, while the majority opinion accurately recites the history and purpose of §2255, see *ante*, at 5–6, it ignores the *import* of that history.  As explained above, when Congress enacted §2255 in 1948, it intended to ensure equivalence between traditional habeas and the new §2255 mechanism for postconviction review.  *Supra*, at 5.  Accordingly, Congress inserted the saving clause to ensure that certain pre-existing postconviction claims (say, a claim of statutory innocence) could still be heard even if the statutory language Congress was adopting inadvertently barred them.  *Supra*, at 3–7.  And Congress preserved the language of §2255(e)—the language that performs the equalizing function—in 1996, even as it made other significant changes to §2255.  *Supra*, at 7–8.

Ignoring all this, the majority grounds its analysis of §2255(e) in a scattershot of lower court cases that the majority claims "[t]raditionally" viewed the saving clause as solving only for practical filing problems.  *Ante*, at 6–7.  To be sure, a handful of lower courts applied the saving clause where the sentencing court was dissolved.  *Ibid.*  But lower courts have also "[t]raditionally," *ante*, at 6, treated the saving clause as permitting individuals with previously unavailable statutory innocence claims to file habeas petitions

in light of §2255(h)'s successive-petition bar. *Prost* v. *Anderson*, 636 F. 3d 578, 605 (CA10 2011) (Seymour, J., concurring in part and dissenting in part).[6] The majority also fails to grapple with *this* Court's own opinions that suggest a broader interpretation of the saving clause is proper. See *Swain* v. *Pressley*, 430 U. S. 372, 381–382 (1977); *Sanders*, 373 U. S., at 14–15; *Hayman*, 342 U. S., at 223; Brief for Respondent 17–18.

It appears the majority's interpretation of §2255(e) is primarily attributable to its concern that interpreting the saving clause to permit Jones to file a habeas petition might authorize an "end-run" around §2255's procedures. *Ante*, at 10–11, 14. I think those fears are vastly overblown.

Properly interpreted, a §2255 motion is only "inadequate or ineffective" when the potential procedural bar does not provide a prisoner with any meaningful opportunity to present a claim. And *that* circumstance does not exist any time a procedural limitation in §2255 screens out a claim. For example, if an individual does not raise his legal innocence claim in a §2255 motion in a timely fashion, see §2255(f), he cannot resort to the saving clause to file a habeas petition; that individual *did* have a meaningful opportunity to raise his claim pursuant to the §2255 process, but missed the window of opportunity. Similarly, where Congress has clearly narrowed the scope of postconviction relief—as it has done for claims of new evidence and new constitutional rules—it has overridden the equivalence aim that would otherwise render §2255 inadequate or ineffective, such that

_____

[6] See also, *e.g.*, *Triestman* v. *United States*, 124 F. 3d 361, 363 (CA2 1997); *In re Dorsainvil*, 119 F. 3d 245, 250–252 (CA3 1997); *In re Jones*, 226 F. 3d 328, 333–334 (CA4 2000); *Reyes-Requena* v. *United States*, 243 F. 3d 893, 904 (CA5 2011); *Hill* v. *Masters*, 836 F. 3d 591, 599–600 (CA6 2016); *In re Davenport*, 147 F. 3d 605, 610–611 (CA7 1998); *Stephens* v. *Herrera*, 464 F. 3d 895, 898 (CA9 2006); *Wofford* v. *Scott*, 177 F. 3d 1236, 1245 (CA11 1999), overruled by *McCarthan* v. *Director of Goodwill Industries-Suncoast Inc.*, 851 F. 3d 1076 (CA11 2017) (en banc).

the saving clause does not apply. On top of this, given the congruence purpose underlying §2255(e), an individual can resort to habeas via §2255(e) only where the particular claim he seeks to bring would have been cognizable under pre-AEDPA principles.

Thus, the majority has no good answer to interpreting the saving clause as doing what Congress crafted it to do— among other things, ensuring equivalence between §2255 and the prior postconviction remedy being replaced or modified, unless Congress clearly establishes otherwise. A successive statutory innocence claim could have been brought prior to the 1996 addition of §2255(h), and Congress has not clearly foreclosed such claims in the text of §2255. Therefore, the saving clause applies, and Jones should have been permitted to raise his legal innocence claim by filing a habeas petition under §2241.

II

The foregoing analysis assumes, as the majority does, that the only hope of a prisoner in Jones's position is to assert his statutory innocence claim via a habeas petition filed under §2241 per the saving clause, because §2255(h) prevents the filing of such a successive §2255 motion. But I would not be so quick to assume that a successive §2255 motion asserting statutory innocence is impermissible due to §2255(h). Here is why.

Nothing in the whole of §2255 suggests that Congress ever considered the scenario presented in this case—one in which a prisoner who has already filed a postconviction motion suddenly gets a new claim of legal innocence (after his first petition was filed) based on a development in Supreme Court case law. Therefore, it is not at all clear that Congress determined that such an individual is simply out of luck. Far from making the decision that a prisoner in this circumstance should not be permitted to raise that newly

available claim by filing another §2255 motion—as the majority maintains—Congress has simply never spoken to what is supposed to happen with newly available claims of legal innocence.

To reach today's conclusion, then, the majority draws a "negative inference" that Congress intended for §2255's "second or successive" bar to preclude successive filings that contain legal innocence claims. *Ante*, at 10. But the majority's inferential reasoning is highly problematic in at least two respects.

First, negative inferences drawn without proper context can be notoriously unreliable. And, as detailed below, there are myriad reasons for skepticism here. Section 2255(h)'s anti-claim-splitting purpose is one. Another is the likely reason that legal innocence claims do not appear in the text of the statute (spoiler alert: they were inadvertently omitted). Background equitable principles and the practical consequences of preventing the filing of successive petitions in this circumstance are additional key contextual clues that the majority seems to have missed.

Second, I am suspicious of the majority's choice to resort to inferential reasoning at all, given that this Court has long held that we will not read a statute to displace access to "the great writ" unless Congress has been clear about its intention to accomplish this result. *Ex parte Yerger*, 8 Wall. 85, 95, 102 (1869). The clear-statement rule is plainly applicable here, and the majority offers the flimsiest of explanations for its decision to deviate from its application at the threshold of today's interpretation.

In short, as shown below, the initial assumption that Congress necessarily meant for §2255(h) to bar Jones's successive petition asserting statutory innocence is shaky, at best. I would have held that Jones's petition can proceed, even without reliance on the saving clause, because §2255(h) does not bar it.

A

The majority says that "since [AEDPA], second or successive §2255 motions are barred unless they rely on" one of two (and only two) circumstances: "'newly discovered evidence,' §2255(h)(1), or 'a new rule of constitutional law,' §2255(h)(2)." *Ante*, at 1. Legal innocence claims are barred, the majority holds, pursuant to this "straightforward negative inference." *Ante*, at 10. But there is a good reason that the negative-inference canon "must be applied with great caution." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012). And the reason is that "its application depends so much on context." *Ibid.* In this case, for instance, there are several strong contextual clues that substantially undercut the majority's purportedly "straightforward" inferential reasoning.

1

First of all, while the majority interprets §2255(h) as if Congress designed that provision to impose "finality" without regard to the claims at issue (other than the two listed situations), see *ante*, at 12, as it turns out, that is not the primary purpose of §2255(h). Instead, §2255(h)'s "second or successive petition" bar was inserted into AEDPA to ensure that all *available* claims a prisoner has are brought in a single postconviction petition. In circumstances where the prisoner seeks to assert a claim that was previously *unavailable* (*i.e.*, a claim that could not have been raised before), Congress permitted successive petitions.

Explaining this fully requires me to make a preliminary big-picture point. Section 2255 (originally and as amended by AEDPA) is not a gauntlet of arbitrary hurdles that Congress has erected to stymie prisoners who seek to obtain judicial review of their detention. Indeed, as explained, when Congress first enacted §2255, it had no intention of shrinking the catalog of available postconviction claims. *Ante*, at

5–6; see also Part I, *supra*. To be sure, Congress has undertaken to restrict the writ's availability somewhat since §2255 was first enacted, but it has nevertheless continued to appreciate the significance of access to postconviction review of the legality of a prisoner's detention. Hence, even after AEDPA, Congress permits all incarcerated individuals—including those who have been convicted of serious crimes and who are serving sentences that have been imposed by courts of competent jurisdiction—to seek collateral relief. See §§2254(a), 2255(a).

Still, when it enacted AEDPA in 1996, Congress was aware of how §2255's postconviction processes had been operating on the ground since §2255's enactment. Thus, Congress quite rationally sought to "'balance'" the "'individual interest in justice that arises in the extraordinary case'" with "'the societal interests in finality, comity, and conservation of scarce judicial resources.'" *McQuiggin* v. *Perkins*, 569 U. S. 383, 393 (2013) (quoting *Schlup* v. *Delo*, 513 U. S. 298, 324 (1995)).

Section 2255(h) reflects this balancing. "What emerges from a review of the debates over the successive petition restrictions is a clear sense that" Congress wanted to "preven[t] manipulation of the system through relitigation of previously presented claims or strategic withholding of claims for later presentation," while still creating "a mechanism that would allow prisoners to have one full, fair chance to present their meritorious . . . claims to the federal courts." B. Stevenson, The Politics of Fear and Death: Successive Problems in Capital Federal Habeas Corpus Cases, 77 N. Y. U. L. Rev. 699, 772 (2002). As Senator Hatch said at the time: "We have provided for protection of Federal habeas corpus, but we do it one time and that is it—unless, of course, they can truly come up with evidence of innocence that could not have been presented at trial. There we allow successive petitions." 141 Cong. Rec. 15042 (1995). Then-Senator Biden similarly explained that the goal of AEDPA

was "essentially giving one bite out of the apple to drastically reduce the ability to have successive petitions unless there is some egregious action that is learned about after the petition is filed, the first petition." *Id.*, at 15027.[7]

Thus, Congress enacted §2255(h) to prevent prisoners from engaging in manipulative filing practices—such as claim splitting, *i.e.*, the inefficient business of prisoners with time on their hands doling out their *existing* postconviction claims in a series of successive motions filed in court seriatim. See *Sanders*, 373 U. S., at 18 (noting that a prisoner may "deliberately withhol[d]" or "deliberately abando[n]" claims in a first postconviction petition "in the hope of being granted two hearings rather than one").[8] And, tellingly, because Congress was focused on *that* problem—not attempting to impose "finality" writ large—it did not bar *all* successive petitions; to the contrary, it proceeded to identify particular circumstances in which another collateral challenge *would* be authorized. §§2255(h)(1)–(2).

Additional doubts about the majority's negative inference surface when one recognizes that the two circumstances Congress carved out of the successive-petition bar share an important common thread: Both situations relate to the *newness* of the claim that the prisoner seeks to assert in a successive petition. That is, both prongs of §2255(h) that authorize a successive petition do so where a petitioner

—————

[7] See also H. R. Rep. No. 101–681, pt. 1, p. 111 (1990) (explaining that the purpose of a predecessor bill was "to promote finality" but also "to ensure that habeas corpus petitioners have one fair opportunity to present their Federal claims to the Federal courts").

[8] It appears that, in enacting restrictions on successive petitions, Congress was primarily worried about successive petitions filed by state prisoners on death row, because a petition could delay the execution of a death sentence. See Stevenson, 77 N. Y. U. L. Rev., at 723–730. Indeed, the law is called the Antiterrorism and Effective *Death Penalty* Act. That concern does not apply to a situation like Jones's, since he is not serving a death sentence, and nothing about a successive petition delays the execution of his sentence of imprisonment.

brings a claim that arose after the time in which the prisoner would or could have filed his first petition. *Ibid.* (authorizing successive petitions raising "*newly* discovered evidence" or "a *new* rule of constitutional law" (emphasis added)).

In light of this key observation, the majority's assumption that §2255(h) bars Jones's claim is significantly hobbled. Jones's statutory innocence claim is also "new"—in the sense that it was not available to him when his first §2255 petition was filed.[9]  And Jones's claim shares other features of the circumstances that Congress exempted from the "second or successive" general prohibition as well—including that it implicates innocence, see §2255(h)(1), and stems from a retroactively applicable Supreme Court opinion, see §2255(h)(2).  Nor does the filing of Jones's successive petition implicate any anti-claim-splitting rationale, as Jones did not manipulatively withhold his legal innocence claim during his initial §2255 proceedings.  Indeed, he could not possibly have done so, since this Court did not decide *Rehaif* v. *United States*, 588 U. S. \_\_\_ (2019), which provided the basis for his claim, until nearly two decades after Jones filed his first petition.

In short, it is hard to believe that a Congress that expressly authorized "new" claims involving innocence or those that arise from developments in Supreme Court case

---

[9] Prior to this Court's holding in *Rehaif* v. *United States*, 588 U. S. \_\_\_ (2019), well-established Circuit precedent had barred Jones's claim. *United States* v. *Jones*, 266 F. 3d 804, 810, n. 5 (CA8 2001) (citing *United States* v. *Kind*, 194 F. 3d 900, 906 (CA8 1999)).  After Jones's conviction became final, this Court decided *Rehaif*, which interpreted the elements of Jones's crime of conviction more narrowly than some Courts of Appeals had, and thereby recognized a potential basis for Jones and other similar defendants to claim legal innocence.  And because *Rehaif* was a Supreme Court ruling that changed the scope of a criminal statute, it applied retroactively to individuals (like Jones) whose convictions had become final at the time it was issued.  *Schriro* v. *Summerlin*, 542 U. S. 348, 351–352 (2004); *Bousley* v. *United States*, 523 U. S. 614, 620–621 (1998).

law despite §2255(h)'s successive-petition bar also meant for §2255(h) to preclude Jones from bringing the claim that he seeks to file here.

2

The majority's negative inference also rests on the bald assumption that Congress *intentionally* left statutory innocence out of its list of carveouts, because it wanted those claims to be barred if brought in a successive petition. *Ante*, at 12 (asserting that "Congress has *chosen* finality over error correction" with respect to statutory innocence claims brought in successive petitions (emphasis added)). But there is a perfectly logical alternative explanation for why statutory innocence claims do not appear as express exclusions in the text of §2255(h), an explanation that is based on another important contextual reference point: the enactment history of the statute.

Section 2255(h) was enacted in the same Public Law as §2244(b), a provision that contains analogous second-or-successive petition limitations for *state* prisoners. Indeed, Congress "appears to have modeled §2255(h)(2)" on those state-prisoner provisions. *Chazen* v. *Marske*, 938 F. 3d 851, 863 (CA7 2019) (Barrett, J., concurring) (citing R. Fallon, J. Manning, D. Meltzer, & D. Shapiro, Hart and Wechsler's The Federal Courts and the Federal System 1362 (7th ed. 2015) (Hart & Wechsler)). Like §2255(h), §2244(b)—the model provision—does *not* address statutory innocence claims in any fashion. But that is simply because there is no such thing as a statutory innocence claim in the realm of federal collateral relief for state prisoners. See Hart & Wechsler 1362; see also *Estelle* v. *McGuire*, 502 U. S. 62, 67 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law" (internal quotation marks omitted)).

Thus, as others have observed, when Congress crafted §2255(h) based on the state-prisoner model in §2244(b), it

seems to have "'lost sight of the fact that'" federally incarcerated individuals "'*can* raise federal *statutory* claims in their collateral attacks.'" *Chazen*, 938 F. 3d, at 863 (quoting Hart & Wechsler 1362; emphasis added); *Chazen*, 938 F. 3d, at 863 (suggesting that the omission of legal innocence claims from §2255(h) was due to "congressional oversight"); Reply Brief for Respondent 15.

To me, this contextual revelation rocks the foundation of the majority's negative inference. That is, it is plausible (and perhaps even likely) that Congress did not appreciate fully that the modeled-after language establishing a successive-petition bar did not capture the full scope of available claims for federal prisoners.[10] And, of course, if Congress simply overlooked statutory innocence claims when it crafted §2255(h), then the omitted language that the majority puts so much stock in is not actually indicative of Congress having "chosen finality" with respect to statutory innocence claims. *Ante*, at 12. Instead, the absence of any textual reference to statutory innocence would be wholly unremarkable.

3

Given the purpose and history of §2255(h) as I have just described them, I find quite compelling the Government's observation that "[n]othing in AEDPA [actually] justifies an

_____

[10] The rushed and emotionally charged manner in which AEDPA came into fruition makes Congress's lack of attention to this detail a very realistic possibility. AEDPA was passed in reaction to the Oklahoma City bombing, and President Clinton had "demand[ed]" its passage by the 1-year anniversary of that event. J. Liebman, An "Effective Death Penalty"? AEDPA and Error Detection in Capital Cases, 67 Brooklyn L. Rev. 411, 413 (2011); see also Stevenson, 77 N. Y. U. L. Rev., at 701. Both this Court and commentators have observed that, likely as a result, AEDPA is "shoddily crafted and poorly cohered." L. Kovarsky, Death Ineligibility and Habeas Corpus, 95 Cornell L. Rev. 329, 342 (2010); see also *Lindh* v. *Murphy*, 521 U. S. 320, 336 (1997) ("[I]n a world of silk purses and pigs' ears, [AEDPA] is not a silk purse of the art of statutory drafting").

inference that Congress silently repealed the traditional [postconviction] remedy for federal prisoners who have been imprisoned for conduct that Congress did not criminalize." Brief for Respondent 28. I proceed here to add that nothing *outside* of AEDPA—not the background legal principles that existed at the time Congress enacted the statute, nor the practical consequences of reading §2255(h) in this manner—supports that inference either.

Take equity, for instance. When Congress crafted §2255(h), it legislated against an important background equitable principle pertaining to postconviction relief: Courts should not interpret statutory provisions governing habeas review to even "'run the risk'" of causing prisoners to "'forever los[e] their opportunity for any federal review of their . . . claims.'" *Panetti* v. *Quarterman*, 551 U. S. 930, 945–946 (2007) (quoting *Rhines* v. *Weber*, 544 U. S. 269, 275 (2005)); see also *Stewart* v. *Martinez-Villareal*, 523 U. S. 637, 645 (1998). This means that Congress was well aware that courts consistently "rel[y] on equitable doctrines to carve out . . . ways petitioners can bypass [otherwise applicable] procedural obstacles" when a prisoner has "not had a full and fair opportunity to litigate their federal claims." E. Primus, Equitable Gateways: Toward Expanded Federal Habeas Corpus Review of State-Court Criminal Convictions, 61 Ariz. L. Rev. 291, 305 (2019).[11] Knowing that courts are equitable tribunals that tend to operate in this fashion should have prompted Congress to express its in-

––––––––––

[11] Many of the Courts of Appeals that had read §2255(e) as saving legal innocence claims invoked this equitable principle. See, *e.g.*, *In re Davenport*, 147 F. 3d, at 609; *Triestman*, 124 F. 3d, at 378; *In re Dorsainvil*, 119 F. 3d, at 251. As lower courts also recognized, the impetus to provide a meaningful opportunity for review of a postconviction claim was especially strong when failure to hear the claim might result in a "miscarriage of justice." See *Reyes-Requena*, 243 F. 3d, at 904; *In re Dorsainvil*, 119 F. 3d, at 251.

tention to override that value (assuming that it actually intended to completely foreclose new legal innocence claims). Congress did not do so; yet the majority reads its silence to accomplish that same extraordinarily inequitable result.[12]

The practical consequences that inure from the majority's reading also undercut substantially the negative inference upon which the majority relies. We have consistently warned that courts should "resis[t] an interpretation of [AEDPA] that would 'produce troublesome results' [and] 'create procedural anomalies.'" *Panetti*, 551 U. S., at 946 (quoting *Castro* v. *United States*, 540 U. S. 375, 380 (2003)). The majority does not speak to this at all, but its interpretation of §2255 produces bizarre outcomes.

First, there is the quirky procedural anomaly that arises due to the fact that statutory innocence claims are fully authorized in the postconviction review context. This Court's recognition that a statute covers a narrower scope of criminal conduct than was previously acknowledged falls within the narrow subset of criminal law decisions that are fully retroactive, meaning that a federal prisoner can rely upon that new determination whether his case is still on direct review or not. *Schriro* v. *Summerlin*, 542 U. S. 348, 351–352 (2004); *Bousley*, 523 U. S., at 620–621. But reading §2255(h) to bar a successive petition raising legal innocence would mean that most prisoners who would (remarkably) be eligible for such retroactive relief would turn out to have no mechanism for actually requesting it. A strange practical conundrum, to say the least.

Inferring that §2255(h) bars legal innocence claims when brought in a successive petition also produces stunningly disparate results that bear no relationship to Congress's

---

[12] Theoretically, Jones had "an" opportunity to raise his claim. But, in my view, it was not a *meaningful* one. Well-established Circuit precedent barred the claim at the time of Jones's direct appeal and first petition. See n. 9, *supra*. Jones has never had *any* opportunity, meaningful or otherwise, to rely on *Rehaif*'s authoritative construction.

purported finality goals. Consider two individuals who have been convicted of the same federal crime—perhaps two codefendants who were tried and sentenced together. Both complete their direct appeals, but only one files a §2255 motion within AEDPA's statute of limitations, while the other one decides not to or misses the deadline. If §2255(h) bars a successive petition raising a legal innocence claim, then when *Rehaif* is handed down—altering the elements of the crime of conviction such that *both* prisoners have a colorable claim of legal innocence—only the one who did not previously file a §2255 petition can raise this retroactive statutory innocence claim.

Reference to Congress's interest in "finality" cannot explain this odd unequal treatment. Under the Court's interpretation, a prisoner whose conviction became final *30 years ago* can assert a *Rehaif* claim if he never previously filed a §2255 motion, whereas someone whose conviction became final *2* years ago cannot if he has already had a §2255 petition adjudicated.[13]

Interpreting §2255(h) as completely foreclosing successive petitions bringing statutory innocence claims also places prisoners in an untenable catch-22 that cannot be what any rational Congress actually intended. Consider what has happened in this very case. Per AEDPA's statute of limitations, Jones had to file his first §2255 petition within one year of his conviction becoming final. §2255(f). He did so, and that petition was *successful*; the Eighth Circuit found that Jones had received ineffective assistance of counsel. *United States* v. *Jones*, 403 F. 3d 604, 605 (2005). In the majority's view, by seeking to vindicate his Sixth Amendment rights in this way, Jones has forfeited, forever

---

[13] Accommodating the possibility of retroactively applicable Supreme Court opinions, §2255 runs the statute of limitations not just from the date on which the conviction became final, but also from the date a new, retroactively applicable right was recognized by the Supreme Court. §2255(f)(3).

and for all time, his right to rely on any new retroactive Supreme Court opinion that suggests he is incarcerated for noncriminal behavior. There is no indication that Congress meant for Jones and other prisoners in his position to have to *choose* between pursing an ineffective-assistance-of-counsel claim and a claim of legal innocence.

\*       \*       \*

Despite all this, the majority clings to its "straightforward" negative inference and interprets §2255(h) as a bar to a court's consideration of Jones's legal innocence claim. My point is that, with so many contextual indicators that Congress did not really mean for §2255(h) to be read to preclude new claims of statutory innocence, the Court should have simply determined that Jones's petition, which asserts such a claim, was not plainly barred by §2255(h), and could thus proceed in a successive §2255 petition.

### B

Instead of drawing an inference about the operation of §2255(h), the most "straightforward" way of determining whether Jones's legal innocence claim is precluded by statute, *ante*, at 12, would have been to apply our clear-statement rule to today's interpretation.

#### 1

A "longstanding rule" of this Court, *INS* v. *St. Cyr*, 533 U. S. 289, 298 (2001), the clear-statement rule directs that, before interpreting a congressional enactment as "'clos[ing] the Court's] doors to a class of habeas petitioners,'" the Court must search for a "'clear indication that such was Congress' intent,'" *Panetti*, 551 U. S., at 946 (quoting *Castro*, 540 U. S., at 381). This principle recognizes that Congress must "speak unambiguously when it seeks to effect a result that, although constitutional, would undermine a constitutionally derived value." J. Manning, Textualism and the Equity of the Statute, 101 Colum. L. Rev. 1, 121–

122 (2001) (Manning).  And, before today, this Court has repeatedly recognized the importance of the clear-statement rule with respect to any analysis of an Act of Congress that potentially restricts access to the writ of habeas corpus or its statutory equivalent.[14]  In fact, "where a provision precluding review is claimed to bar habeas review," we have "required a *particularly* clear statement."  *Demore* v. *Kim*, 538 U. S. 510, 517 (2003) (emphasis added).

The clear-statement rule is plainly implicated here.  Under the state of the law at the time AEDPA was enacted, prisoners were entitled to bring a petition to assert a new claim of legal innocence, even a second or successive petition.  *Supra*, at 8–9.  Congress could change that state of affairs, but, under the clear-statement rule, if it intended to do so, it needed to speak clearly to effectuate that result.

At a more general level of analysis, the clear-statement rule also applies to these circumstances because the interpretive question in this case touches upon the venerated writ of habeas corpus—the only writ that is expressly mentioned in the Constitution.  Art. I, §9, cl. 2; *Holland*, 560 U. S., at 649.  We have long recognized that the clear-statement rule serves the core liberty interests protected by the writ of habeas corpus.  See *Ex parte Yerger*, 8 Wall., at 103 (holding, more than 150 years ago, that the Court had jurisdiction over a particular habeas petition and relying on the clear-statement rule to reach that conclusion, explaining that, to conclude otherwise, would "greatly weaken the efficacy of the writ" and "deprive the citizen in many cases of its benefits").  Likewise, in modern times, we have been especially careful to reference clear-statement principles,

---

[14] See, *e.g.*,  *Boumediene* v. *Bush*, 553 U. S. 723, 738 (2008); *McQuiggin* v. *Perkins*, 569 U. S. 383, 397 (2013); *Holland* v. *Florida*, 560 U. S. 631, 646 (2010); *Panetti* v. *Quarterman*, 551 U. S. 930, 946 (2007); *Hamdan* v. *Rumsfeld*, 548 U. S. 557, 575 (2006); *Demore* v. *Kim*, 538 U. S. 510, 517 (2003); *Castro* v. *United States*, 540 U. S. 375, 381 (2003); *INS* v. *St. Cyr*, 533 U. S. 289, 298 (2001); *Ex parte Yerger*, 8 Wall. 85, 102 (1869).

and thereby eschew statutory interpretations that would (perhaps unintentionally) foreclose judicial review of post-conviction claims, even where the text of the statute might (sometimes even strongly) suggest otherwise.[15]

Furthermore, and significantly for present purposes, we have already determined that the necessary "clear statement" here—*i.e.*, the signal from Congress that justifies reading a statute as foreclosing access to venerated post-conviction review processes—*cannot be derived from negative inferences* drawn from statutory text. In *Ex parte Yerger*, for instance, we declared that interpreting a statute to "[r]epea[l] by implication" habeas jurisdiction is "not favored." 8 Wall., at 105. More recently, we warned (again) that "[i]mplications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction; instead, Congress must articulate specific and unambiguous statutory directives to effect a repeal." *St. Cyr*, 533 U. S., at 299 (citing *Ex parte Yerger*, 8 Wall., at 105). And, again, in *Holland*, this Court explained that the clear-statement rule

————————

[15] For example, we cited the clear-statement rule when declining to read §2244(b)(2), which generally prohibits second or successive habeas petitions filed by state prisoners, as blocking a second-in-time habeas petition that raised an incompetent-to-be-executed claim, even though, literally read, the statute could have done so. *Panetti*, 551 U. S., at 942–943, 945–946. Similarly, in *Holland*, the Court relied on the clear-statement rule when evaluating AEDPA's 1-year statute of limitations, holding that the unequivocal statutory limitations period can be equitably tolled, even though the text of AEDPA did not include equitable tolling among the enumerated exceptions. 560 U. S., at 646–649. Likewise, in *Castro*, the Court used the clear-statement rule to reject the argument that §2244(b)(3)(E)—which prohibits habeas petitioners from seeking certiorari review of a "'grant or denial of an authorization by a court of appeals to file a second or successive application'"—prevented this Court from reviewing whether the lower courts had mistakenly concluded that the federal prisoner's petition was in fact a "second or successive" petition. 540 U. S., at 379–381. Finally, in *St. Cyr*, the Court utilized the clear-statement rule to dispense with the contention that AEDPA stripped federal courts of jurisdiction to review a noncitizen's habeas petition raising a pure question of law. 533 U. S., at 298–299, 314.

generally prohibits a court from inferring that the "inclu[sion of] one item . . . is to exclude other similar items" in order to read a statute as forbidding review of a postconviction claim. 560 U. S., at 648; see also *id.*, at 649 ("counsel[ing] hesitancy before interpreting AEDPA's statutory silence as indicating a congressional intent to close courthouse doors"). Yet, here, as the majority appears to admit, the only way to read §2255(h) as barring Jones's statutory innocence claim is to *infer* that such preclusion is what Congress intended. *Ante*, at 10, 23.

This case would have been easily resolved if we had applied the clear-statement rule at the outset, as we have always done in cases of this nature. Doing so would have appropriately eliminated a reading of §2255(h) that forecloses access to habeas relief by negative implication. Use of the rule would have thus protected core constitutional norms by "ensur[ing] Congress does not, by broad or general language, legislate on a sensitive topic inadvertently or without due deliberation." *Spector* v. *Norwegian Cruise Line Ltd.*, 545 U. S. 119, 139 (2005) (opinion of Kennedy, J.); see also *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 65 (1989).

2

In the last few pages of its opinion, the Court makes the unceremonious (but still startling) announcement that the clear-statement rule is inapplicable to today's analysis of §2255(h). *Ante*, at 23–25.[16] Try as it might, in my view, the majority has failed to provide a single persuasive reason for this dramatic break.

First, the majority suggests that the clear-statement rule is not appropriate when interpreting provisions related to

—————

[16] It appears that no one but the Court's majority even thought it possible to sidestep the clear-statement rule with respect to today's interpretive exercise. Both Jones and the Government expressly invoked it. And Court-appointed *amicus* did not dispute its applicability.

"finality"—and seems to draw a line between AEDPA's statute of limitations, which does get clear-statement treatment, and its provisions governing successive petitions. *Ante*, at 23–24. This is nonsense. Both AEDPA provisions use similar language. §2255(f) ("A 1-year period of limitation shall apply to a motion under this section"); §2255(h) ("A second or successive motion must . . . contain . . ."). And both procedural limitations relate to Congress's interest in finality. *Ante*, at 24; *Wood* v. *Milyard*, 566 U. S. 463, 472 (2012) (noting that AEDPA's statute of limitations "lends *finality* to . . . court judgments within a reasonable time" (emphasis added; internal quotation marks omitted)).[17]

Next, the majority conspicuously downplays the stakes in this case. Not once does its opinion make direct mention of the fact that the claim the majority says §2255(h) silently precludes is one that implicates core values because it involves *legal innocence*. Instead, the majority repeatedly describes Jones's bid for access to the postconviction review process as bringing a mere "statutory" claim. *Ante*, at 2, 12, 21, 23.[18] But statutory claims that suggest a person's innocence are different in kind from more run-of-the-mill statutory claims, such as a technical, nonprejudicial violation of a criminal procedure rule. See *United States* v. *Addonizio*,

———————————

[17] This Court has also treated these two provisions as similarly susceptible to equitable exceptions; for instance, the "miscarriage of justice" principle that permits bypassing procedural barriers applies to both. *McQuiggin*, 569 U. S., at 386, 392–393; *Schlup*, 513 U. S., at 320.

[18] The euphemistic manner in which the Court's opinion tiptoes around what Jones is actually arguing is noteworthy. The majority says that, by operation of §2255(h), prisoners in Jones's position cannot take advantage of "a more favorable interpretation of statutory law," *ante*, at 1, which it also obliquely characterizes as "an intervening change in statutory interpretation," *ante*, at 3, or "a newly adopted narrowing interpretation of a criminal statute," *ante*, at 9. In fact, the word "innocence" only appears in the Court's opinion when recounting the Government's arguments. *Ante*, at 21, 23. If the majority has spared a thought for the appropriate standard when a petitioner is claiming legal innocence, I could not find it in the Court's opinion.

442 U. S. 178, 186–187 (1979); *Davis*, 417 U. S., at 346–347 (citing *Hill* v. *United States*, 368 U. S. 424, 428–429 (1962)). In any event, the majority does not cite a single case that suggests that an Act of Congress that threatens to cut off access to habeas (or its statutory equivalent) should be treated any differently for purposes of application of the clear-statement rule if a petitioner's claim has a statutory basis.

The majority's most full-throated defense of its jettison-ing of clear-statement principles lies in its attempt to cast statutory innocence claims as not "historically or constitu-tionally grounded." *Ante*, at 24–25. The first and most ob-vious problem with this effort is that the historical pedigree of a claim is irrelevant for clear-statement purposes. The clear-statement rule is applicable here because the statute being interpreted involves *access to the writ of habeas cor-pus*—a significant constitutional value that we would not assume Congress would discard without careful considera-tion. See Manning 121–122; see also *Holland*, 560 U. S., at 646–649. And, so triggered, our clear-statement canon of construction is not rendered inapplicable just because the particular type of claim that a prisoner seeks to advance in the context of a habeas or postconviction proceeding (if he is afforded one) might not date back to the founding era. This must be why the majority cites no precedent that splices the clear-statement rule in this fashion.

Looking back to the time of the founding to determine whether the clear-statement rule applies to our interpreta-tion of a statute passed in 1996 also makes no sense. The clear-statement question relates to what Congress intended with respect to the meaning of the statute *at the time it was enacted*. When Congress introduced §2255(h), it codified or changed the law that existed at that time (*i.e.*, in 1996). See, *e.g.*, *Slack* v. *McDaniel*, 529 U. S. 473, 483 (2000) (not-ing that AEDPA's certificate-of-appealability provisions codified the prevailing judicial standard). Thus, when this

Court has previously applied the clear-statement rule and analyzed the meaning of particular AEDPA provisions, the feelings of the Framers were of no moment. Instead, we properly examined the law leading up to AEDPA's enactment, not founding-era sources. See, *e.g.*, *Panetti*, 551 U. S., at 944; *Magwood* v. *Patterson*, 561 U. S. 320, 337 (2010) (plurality opinion).

Even if the majority was right with respect to its assumption that founding-era practices bear on whether the clear-statement rule applies here, historical practice plainly undermines its assertion that legal innocence claims are of recent vintage. Supreme Court Justices riding circuit in the early 19th century repeatedly considered the merits of habeas petitions filed by individuals who argued they were being wrongfully incarcerated because the laws that had been invoked to justify their confinement, properly construed, did not reach their conduct.[19] Moreover, and importantly,

_____

[19] *Ex parte D'Olivera*, 7 F. Cas. 853, 854 (No. 3,967) (CC Mass. 1813) (Story, J.) (construing a 1790 statute criminalizing desertion from a merchant ship by "seamen engaged in the merchants' service of the United States" as not covering certain "foreign seamen in foreign vessels" and granting habeas relief to such persons); *United States* v. *Bainbridge*, 24 F. Cas. 946, 951–952 (No. 14,497) (CC Mass. 1816) (Story, J.) (considering on the merits, but ultimately rejecting, a habeas petitioner's argument that an enlistment law did not apply to minors enlisted without parental consent); *Ex parte Randolph*, 20 F. Cas. 242, 254–257 (No. 11,558) (CC Va. 1833) (Marshall, C. J.) (granting habeas relief to an individual civilly imprisoned because the statute at issue, properly interpreted, did not apply to the petitioner); see also, *e.g.*, *Grant* v. *United States*, 58 F. 694, 695–697 (CA9 1893) (granting writ of error to individuals who had been convicted following a trial, on the ground that the law at issue, "fairly interpreted," did not reach the petitioners' conduct because "the case does not come within the letter of the statute," and citing cases reaching the same conclusion); *In re Wahll*, 42 F. 822, 825–826 (Minn. 1890) (considering, but rejecting on the merits, a convicted prisoner's claim that his acts did not amount to a violation of a federal law criminalizing the mailing of obscene letters).

The majority has plainly expended a considerable amount of effort to

since the mid-19th century, the statutory scheme for post-conviction review has permitted petitions based not only on a "violation of the constitution" but also on a "violation of the . . . law of the United States."  Judiciary Act of Feb. 5, 1867, ch. 28, §1, 14 Stat. 385; see also §2255; W. Church, Writ of Habeas Corpus §169, p. 249 (2d ed. 1893) ("The issue raised on the hearing of a habeas corpus may be one of law simply").[20]

To the extent the majority's assessment of the purportedly nascent nature of statutory innocence claims rests on its view that, at the time of the founding, habeas relief was rarely available when a petition was brought by a *convicted* individual (as opposed to a pretrial *detainee*), *ante*, at 15–19, there are two additional problems.  For one thing, even assuming that a detainee-versus-convict scope-of-habeas distinction existed at the dawn of our Nation, Congress has

---

distinguish all of these cases.  See *ante*, at 18–19, and n. 8.  Still, its vigorous attempt falls short.  For example, the majority tries to distinguish *Wahll* on the ground that the court "considered but rejected a similar argument for ordering pretrial release."  *Ante*, at 19, n. 8.  But it ignores that the *Wahll* court *still considered the merits* of the statutory argument; the court did not dismiss the case on the ground that such statutory arguments were not cognizable after the prisoner's conviction.  42 F., at 825–826.

[20] This argument that statutory claims are not cognizable in the post-conviction or habeas context has already been considered—and rejected—by this Court.  For example, in *St. Cyr*, this Court cited various 17th- and 18th-century cases to conclude that the "issuance of the writ" of habeas corpus "encompassed detentions based on errors of law, including the erroneous application or interpretation of statutes."  533 U. S., at 302.  And, in *Boumediene*, the Court reiterated that it is "*uncontroversial* . . . that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law."  553 U. S., at 779 (quoting *St. Cyr*, 533 U. S., at 302; emphasis added).  Not once does the majority engage with the propositions stated in these cases.  Nor does the majority grapple with the express statutory language in both the Judiciary Act of 1867 and §2255 authorizing claims premised on violations of the "'law of the United States.'"  *Supra*, at 32.

now squarely rejected it.[21]  However grounded in history
and tradition the Court's own view of the scope of habeas
might be, it is obviously not shared by the Legislature that
enacted the statute we are now interpreting.

Second, here again, the majority evaluates the historical
pedigree of legal innocence claims based on faulty history.
It maintains that, historically, a court could review a ha-
beas petition filed by a convicted individual only for "juris-
dictional" errors (which the majority defines narrowly).
*Ante*, at 15–18, 24–25; cf. *Edwards* v. *Vannoy*, 593 U. S. ___,
___–___ (2021) (GORSUCH, J., concurring) (slip op., at 2–8).
But those who have researched this contention have called
it "narrative and myth but not history."  L. Kovarsky, Ha-
beas Myths, Past and Present, 101 Texas L. Rev. Online 57,
79 (2022) (Kovarsky); see also J. Siegel, Habeas, History,
and Hermeneutics, 64 Ariz. L. Rev. 505, 524–532 (2022)
(Siegel); *Brown* v. *Davenport*, 596 U. S. ___, ___–___ (2022)
(KAGAN, J., dissenting) (slip op., at 2–8).[22]

_____

[21] Section 2255 explicitly authorizes a convicted prisoner to "move the
court which imposed the sentence" for the prescribed relief, and it allows
petitions to be filed after "the date on which the judgment of conviction
becomes final."  §§2255(a), (f)(1).  Also, the major procedural change ac-
complished by Congress's adoption of §2255 in 1948 was to transfer the
filing of postconviction petitions from the district of confinement to the
sentencing court, see *United States* v. *Hayman*, 342 U. S. 205, 215–216
(1952)—a shift that only makes sense if Congress contemplated postcon-
viction challenges.

[22] The majority relies heavily on *Ex parte Watkins*, 3 Pet. 193 (1830),
to support its purported "jurisdictional" line.  *Ante*, at 15–18.  But *Wat-
kins* does not stand for the broad proposition that the majority derives.
*Watkins* "itself relies on contested habeas history," and is (as scholars
have explained) distinguishable.  Kovarsky 70–71.  That *Watkins* cannot
mean what the majority says is confirmed by the numerous "19th and
early 20th century cases . . . that undeniably decided the merits of con-
stitutional claims that were not premised on the detaining authority's
lack of jurisdiction or application of an unconstitutional statute or sen-
tence."  Hertz & Liebman §2.4[c], at 44.

At the very least, this take on early habeas practice appears contradicted by *United States* v. *Bainbridge*, 24 F. Cas. 946 (No. 14,497) (CC Mass. 1816) (Story, J.). There, Justice Story considered a statutory innocence claim on the merits even though the individual had already pleaded guilty. *Id.*, at 949, 951–952. And the postconviction/preconviction distinction also runs headlong into other precedents that have looked back on history and do not subscribe to such a narrow view. *St. Cyr*, 533 U. S., at 302 ("[T]he issuance of the writ was not limited to challenges to the jurisdiction of the custodian"); *Fay* v. *Noia*, 372 U. S. 391, 404 (1963) ("Nor is it true that at common law habeas corpus was available only to inquire into the jurisdiction, in a narrow sense, of the committing court" (citing *Bushell's Case*, Vaughn. 135, 124 Eng. Rep. 1006 (C. P. 1670))).

Thus, assuming, *arguendo*, that the historical grounding of the particular type of claim Jones sought to bring even matters, the majority is mistaken when it contends that a statutory innocence claim (including one brought in a successive petition) is not sufficiently historical to warrant application of our clear-statement rule.

* * *

If the majority had applied the clear-statement rule, as it should have, to determine whether §2255(h) precludes successive postconviction petitions that assert statutory innocence claims, today's interpretive task would have merely involved answering one simple question: Is there an unambiguous sign in the text of §2255 that Congress meant for §2255(h) to strip an incarcerated individual of any opportunity to raise a new claim of legal innocence in a motion brought in federal court? No such sign exists.[23] Therefore,

_____

[23] The majority does not appear to dispute this conclusion, as it only engages with the clear-statement rule to categorically reject its applicability. *Ante*, at 23–25. The majority does not—and cannot—establish that, if applied here, the clear-statement rule is satisfied.

we could have (and should have) easily concluded that there is no statutory impediment to Jones's §2255 motion being entertained by a court.

## III

Finally, I believe that the canon of constitutional avoidance also does important work to guide—and constrain—the Court's interpretation of §2255 in this case. See *Zadvydas* v. *Davis*, 533 U. S. 678, 689 (2001); cf. *Pressley*, 430 U. S., at 381–382 (relying on the saving clause to conclude that the District of Columbia's postconviction statute, which mirrored §2255, was constitutional). The majority's bottom line, reading "the interplay" between §2255(h) and §2255(e), *ante*, at 1, is that a person in prison for noncriminal conduct cannot ask a federal court to review the legality of his detention if he has previously filed a §2255 petition. This position is stunning in a country where liberty is a constitutional guarantee and the courts are supposed to be dispensing justice. It also raises hackles under at least two provisions of our founding charter.

First, the Eighth Amendment. There is a nonfrivolous argument that the Constitution's protection against "cruel and unusual punishment" prohibits the incarceration of innocent individuals. See *In re Davis*, 557 U. S. 952, 953 (2009) (Stevens, J., concurring) (citing *Triestman* v. *United States*, 124 F. 3d 361, 377–380 (CA2 1997)); see also *Herrera* v. *Collins*, 506 U. S. 390, 432, n. 2 (1993) (Blackmun, J., dissenting) ("It . . . may violate the Eighth Amendment to imprison someone who is actually innocent"); *Robinson* v. *California*, 370 U. S. 660, 667 (1962). This is not to say that the Eighth Amendment creates a "freestanding entitlement to a second or successive round of postconviction review." *Ante*, at 20. But here Jones seeks a *single* meaningful opportunity to have a federal court consider his claim of legal innocence.

The majority's interpretation also implicates the Suspension Clause. Art. I, §9, cl. 2. The majority admits that, at a minimum, the Suspension Clause protects the right of habeas corpus as it existed at the time of the founding.[24] See *ante*, at 15. The majority also seems to acknowledge that, in the late 18th century, an individual—even one who had been convicted of a crime—could invoke habeas to raise a "jurisdictional" error. *Ante*, at 15, 24–25. Historically, the term "'jurisdictional'" when used by habeas courts "meant something much broader then than it means now." Kovarsky 75; see also Siegel 524. And, importantly, a court lacked "jurisdiction"—and thus the writ could issue—when a person was incarcerated for noncriminal behavior.[25]

_____

[24] I reject the majority's suggestion that the Suspension Clause protects *only* the scope of the great writ as it existed in the founding era. Historical habeas practice provides the floor, and not the ceiling, of Suspension Clause protection. *St. Cyr*, 533 U. S., at 301 ("*[A]t the absolute minimum*, the Suspension Clause protects the writ 'as it existed in 1789'" (quoting *Felker* v. *Turpin*, 518 U. S. 651, 664 (1996); emphasis added)). The habeas remedy has "a dynamic element which itself was adopted by the framers," W. Hurst, The Process of Constitutional Construction, in Supreme Court and Supreme Law 61 (E. Cahn ed. 1954) (statement of P. Freund), such that "to truly understand the scope of the writ 'as it existed in 1789' is to understand its protean dynamism, not any of its specific applications," S. Vladeck, The New Habeas Revisionism, 124 Harv. L. Rev. 941, 991 (2011); see also P. Halliday, Habeas Corpus: From England to Empire 160 (2010). But resolving that debate is unnecessary because Jones's claim implicates even the majority's crabbed view of the Suspension Clause.

[25] See, *e.g.*, *Ex parte Siebold*, 100 U. S. 371, 376–377 (1880) (noting that a court's "authority" to "try and imprison" an individual stems from a particular statute and therefore a court has "no jurisdiction" if the law does not lawfully apply to the prisoner); *Ex parte Bollman*, 4 Cranch 75, 136 (1807) ("[A]s the crime with which the prisoners stand charged has not been committed, the court can only direct them to be discharged"); *Matter of Corryell*, 22 Cal. 178, 181 (1863) ("The Court derives its jurisdiction from the law, and its jurisdiction extends to such matters as the law declares to be criminal, and none other, and when it undertakes to imprison for an offense to which no criminality is attached, it acts beyond its jurisdiction"); *Bushell's Case*, Vaughn. 135, 124 Eng. Rep. 1006 (C. P.

JACKSON, J., dissenting

Thus, it appears that, by its own lights, the majority today renders an interpretation of §2255 that has potentially significant constitutional implications.

## IV

I conclude with an observation. Today's ruling follows a recent series of troubling AEDPA interpretations.[26] All of these opinions have now collectively managed to transform a statute that Congress designed to provide for a rational and orderly process of federal postconviction judicial review into an aimless and chaotic exercise in futility. The route to obtaining collateral relief is presently replete with imagined artificial barriers, arbitrary dead ends, and traps for the unwary. And today's turn makes the journey palpably absurd: It begins with the Supreme Court's (rare) announcement that a certain claim for release exists and is retroactively available to incarcerated individuals on collat-

_____

1670); W. Church, Writ of Habeas Corpus §236, p. 327 (2d ed. 1893) ("[T]he prisoner may be discharged on habeas corpus, either before or after judgment, where the statute or ordinance under which the proceedings are inaugurated against him, is unconstitutional, as this is a jurisdictional defect").

[26] See, *e.g.*, *Shoop* v. *Twyford*, 596 U. S. \_\_\_, \_\_\_ (2022) (slip op., at 11) (restricting the ability of federal courts to use the All Writs Act in AEDPA cases); *Shinn* v. *Martinez Ramirez*, 596 U. S. \_\_\_, \_\_\_, \_\_\_–\_\_\_, \_\_\_–\_\_\_ (2022) (slip op., at 13, 15–16, 21–22) (holding that, although ineffective assistance of postconviction counsel can be cause to excuse a procedural default of a trial-ineffective-assistance-of-counsel claim, a federal court cannot gather evidence to establish postconviction counsel's ineffectiveness); *Brown* v. *Davenport*, 596 U. S. \_\_\_, \_\_\_, \_\_\_–\_\_\_, \_\_\_, \_\_\_ (2022) (slip op., at 1, 5–7, 14, 25) (holding that a state prisoner who shows that a trial error prejudiced him under this Court's federal-habeas harmless-error standard must also run an AEDPA-derived gauntlet before receiving habeas relief); *Edwards* v. *Vannoy*, 593 U. S. \_\_\_, \_\_\_–\_\_\_, \_\_\_ (2021) (slip op., at 10–11, 15) (eliminating, without any party requesting it, the ability of prisoners to argue that a new rule of criminal procedure announced by this Court should be fully retroactive as a "watershed" rule); see *id.*, at \_\_\_–\_\_\_ (KAGAN, J., dissenting) (slip op., at 12–13).

eral review, and ends with the realization that only an arbitrarily determined sliver of eligible prisoners (those who have not had the temerity to file a prior motion) are actually in a position to even ask a court to consider whether any such relief might be provided.

It is quite clear that the Court's rulings in this area of the law reflect a general ethos that convicted prisoners should not be permitted to file §2255 motions or obtain postconviction relief at all. But what matters is what *Congress* wants with respect to the operation of the statutory provisions it enacts. And, as I have shown, Congress's aim in crafting §2255 was to permit convicted prisoners to file postconviction motions asserting claims for collateral relief in a manner that also curbs abusive filings. Congress did not speak—one way or the other—as to what should happen if a prisoner who has previously filed a §2255 motion gets a new claim of legal innocence due to an intervening change in the law.

Given Congress's silence on this matter, in my view, there is simply no justification for drawing a negative inference that Congress meant for §2255 to operate in a manner that is patently inconsistent with the reasons it passed that statute, or the background principles that animated the law more broadly at the time of the statute's enactment, or even (possibly) core constitutional principles. Instead, §2255(e) should be read—consistent with Congress's general intent to ensure equivalence between the claims available in habeas and those that its new postconviction mechanism allowed—to permit prisoners who have a new and retroactive statutory innocence claim to file a habeas petition in lieu of a §2255 motion. Alternatively, we should honor Congress's clear interest in preserving a prisoner's ability to have one meaningful opportunity to have all of his claims presented to a court, by allowing Jones to file a petition asserting his new and retroactive claim of statutory innocence, notwithstanding what might otherwise be perceived as an ironclad

bar in §2255(h).

In other words, as I see it, the negative inference that the majority draws today rests on nothing—and certainly nothing that actually derives from Congress's intent. Nothing in the text of §2255, background principles concerning habeas relief, or AEDPA's enactment history compels (or even supports) the conclusion that Congress intended to completely foreclose claims like Jones's. And it is especially perverse to read the statute to lead to that result when doing so gives rise to legally dissonant, arbitrary, and untenable outcomes. So, the majority's "straightforward" determination that this statute *does* preclude a prisoner in Jones's position from filing a successive petition to assert a legal innocence claim (which it reaches by refusing to follow the procedural norm that would have correctly framed the issue as a matter of congressional intent relative to clear-statement principles) appears to stem from the Court's own views concerning finality, not the will of Congress.

Ultimately, of course, this all begs the question of how (and whether) Congress will respond to the Court's systematic neutering of the balanced postconviction processes that the Legislature has established. It seems to me that today's opinion—which unjustifiably closes off all avenues for certain defendants to secure meaningful consideration of their innocence claims—creates an opening for Congress to step in and fix this problem.